**STATE**

**v.**

**Gerald S. MASTRACCHIO, Jr.**

**No. 90–548–C.A.**

Supreme Court of Rhode Island.

March 23, 1992.

**490**

James E. O'Neil, Atty. Gen., Annie Goldberg, Special Asst. Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal for the second time. In the first appeal, *State v. Mastracchio*, 546 A.2d 165 (R.I.1988), we affirmed the defendant's conviction of murder in the first degree in all respects except for the issue of whether the Superior Court had jurisdiction to try him for this offense.

The defendant, Gerald S. Mastracchio, Jr., was seventeen years of age at the time of the murder of Richard Valente (Valente), who was thirteen. The defendant was twenty-three years of age at the time he was charged, tried, and convicted. Prior to trial and at trial, he argued that at the time of the offense he was a juvenile and that only the Family Court had jurisdiction to try him. After resolving all the other issues raised on defendant's appeal, we remanded the case to the Superior Court for a hearing and findings on whether the Family Court would have waived its jurisdiction over the accused juvenile if the evidence of defendant's guilt had become available to the authorities at the time the murder occurred.

The waiver-hearing justice decided a waiver would have been ordered. The de-fendant then filed this appeal. For the reasons that follow, we affirm the decision of the Superior Court.

The seminal case discussing whether a waiver of juvenile jurisdiction is proper is *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In *Kent* the United States Supreme Court established that certain due process rights must be observed for a valid waiver of juvenile jurisdiction to occur. The *Kent* Court held that social service records, probation reports, and other similar records regarding juveniles must be made available to their attorneys. *Id.* at 562–63, 86 S.Ct. at 1057–58, 16 L.Ed.2d at 98. Moreover, the defendant must be given a hearing at which he or she would have the assistance of counsel. *Id.* at 561, 86 S.Ct. at 1057, 16 L.Ed.2d at 97. At the hearing the Juvenile Court would have considerable latitude to decide whether it should retain or whether it should waive jurisdiction over the juvenile. That latitude, however, is not complete. There must be a procedural regularity, sufficient in the particular circumstances, to satisfy the basic requirements of due process and fairness as well as compliance with the statutory requirements of a full investigation. *Id.* at 552–53, 86 S.Ct. at 1053, 16 L.Ed.2d at 92–93.

Subsequent to *Kent* this court decided *Knott v. Langlois*, 102 R.I. 517, 231 A.2d 767 (1967), in which we held that Knott, an adult at the time of trial but a juvenile at the time of the crime, was entitled to a hearing under *Kent*, at which he would be represented by counsel and would have access to the juvenile's social service and juvenile records. This court added to the *Kent* requirements that the defendant was entitled to findings of fact as well as a statement of the reasons for the waiver determination. *Id.* at 522, 231 A.2d at 769. This court also identified the factors that the waiver justice should consider in reaching a decision to waive. They are (1) the seriousness of the offense, (2) the prosecutive merit of the case, (3) the defendant's record, (4) the safety concerns for the community, and (5) the potential for rehabilitation. *Id.* at 527–28, 231 A.2d at 772. This

court also made mention of a Harvard Law Review article entitled, Note, *Juvenile Delinquents: The Police, State Courts, and Individualized Justice,* 79 Harv. L.Rev. 775 (1966). In that article an additional relevant factor discussed was the nature of the crime and the sophistication of the criminal method employed. *Knott,* 102 R.I. at 528, 231 A.2d at 772.

The Legislature addressed the question of waiver of juvenile jurisdiction when it enacted G.L.1956 (1981 Reenactment) § 14–1–7.[1] That section provided that the Juvenile Court could waive jurisdiction for trial before the Superior Court after a full investigation to try any child aged sixteen years or older charged with a crime that would produce an indictment if the child were an adult. Of course, if the waiver occurred, the child would be tried in Superior Court. Rule 12 of the Rules of Juvenile Procedure adopted by the Family Court established the procedure for and the standards to be considered in such a waiver hearing. The rule addresses all the criteria and considerations addressed in *Kent* and *Knott.*

Finally, in the case of *In re Frances J.,* 456 A.2d 1174 (R.I.1983), this court expressed the observation that "in cases involving juveniles who have almost reached their eighteenth birthdays and when they are charged with a serious offense of the type involved in the case at bar, the Family Court should seriously consider waiver of jurisdiction pursuant to G.L.1956 (1981 Reenactment) § 14–1–7." 456 A.2d at 1175 n. 1. In *Frances* the offense was a crime of passion, the stabbing of a girl to death in a dispute over a boyfriend.

Following our remand, the trial justice conducted an extensive hearing on the question of waiver during several sessions extending over a period of more than a year. When rendering his decision, he correctly described his duties as requiring that he "place myself in the position of the Family Court Judge, back when this offense allegedly took place, to determine whether or not a Family Court Judge, at that time, would have waived jurisdiction of the Family Court in order to have defendant tried as an adult in the Superior Court."

The evidence presented by the state at the waiver hearing consisted of the entire transcript of defendant's trial in which he was convicted; the criminal record of Geraldo G. Mastracchio, defendant's father; and the intake report of the Family Court and the Family Court record regarding defendant himself—all of which items were admitted as exhibits in this case.

From these exhibits we learn that Richard Valente's parents testified at defendant's trial. They described their son at age thirteen as a youngster physically large and mature for his years who was a follower rather than a leader. He had suffered a severe head injury in an automobile accident that changed his personality. As a result of the injury Valente had a plate of some type inserted in part of his skull. He had developed a shyness or fear of people. He sought the company and the protection of older boys for security. He was frequently in the company of defendant. He had been caught attempting to remove a radio from an automobile parked at the apartment complex where he lived. When his mother brought him to the West Warwick police station, he admitted that he had attempted the theft at the instigation of defendant and Steven Dionne and a person named Landi.

Peter Gilbert (Gilbert) testified at defendant's trial that when he came back to Rhode Island, having escaped from prison in Florida, the first people he went to see were the Mastracchios. Gilbert had known defendant from the time defendant was seven years old. Gilbert testified that defendant had admitted to him that he had beaten Valente with the help of Dionne,[2]

1. General Laws 1956 (1981 Reenactment) § 14–1–7 has been amended by P.L.1990, ch. 15, § 2; P.L.1990, ch. 18, § 2 and is now entitled Waiver of jurisdiction or certification hearing. Those amendments became effective in 1990 and have no application to this case and, in any event, did not alter the basic concept.

2. Dionne was dead at the time of trial of causes unrelated to these events.

who was also concerned that Valente would talk to the police about crimes they had committed. Gilbert testified that defendant said he had been cultivating Valente because Valente was about to come into money from an automobile-accident settlement. The two youths "gave him [Valente] a severe beating," "smacked his head in and threw him in the car," and drove toward Newport to dispose of the body. When they heard noises coming from the body, they were on the Jamestown bridge. Fog concealed them from oncoming traffic and no headlights were visible from other cars. They stopped the car and "dumped Valente over the rail and watched until he hit the water." Valente's body was discovered a few days later, washed ashore at Jamestown.

Gilbert acknowledged before the jury that he was a convicted felon who, at the time defendant admitted the Valente murder to him, was in Rhode Island, having escaped from prison in Florida. At the time of his testimony, Gilbert said he was in the protective custody of the Providence police, serving certain sentences imposed by the States of Maine and Florida. He admitted to a criminal career with convictions of fifteen very serious criminal offenses in Maine, Massachusetts, Florida, and Rhode Island for which he had served or was serving sentences. He admitted that he had been involved in three murders. He was cooperating with the authorities by giving information to the police about several crimes in which he had been involved or of which he had knowledge. The Valente murder was one of those cases in which he assisted the authorities.

He had entered into a signed agreement with the Attorney General in which he agreed to give information in his possession in exchange for financial support and for protection for his family. According to the agreement, if he testified truthfully in cases in which he was called upon, the Attorney General would recommend to the court a maximum of a fifty-year sentence with ten years to serve on all outstanding charges. He described his custodial situation as a lockup situation in the custody of the Providence police department. "I have

a 24–hour guard seven days a week * * * in a cell block area" with "[b]ars on the windows."

The Bureau of Criminal Identification record on defendant's father, presented at the waiver hearing, records a life of serious crime beginning in 1941, ranging from assaults on a police officer, rape, robbery, and murders committed in 1969, 1982, and 1985. It appears that the elder Mastracchio began serving a life sentence for murder in 1970, when defendant would have been about seven years old. The trial justice acknowledged the testimony of defendant's mother that he was a good boy and that at the time of the offense, defendant was a member of the local Boys' Club where he had no record of trouble.

The Family Court records on defendant himself at the time the Valente murder occurred were not extensive. His prior contacts with the juvenile authorities involved one breaking-and-entering charge, which was placed on file on a not-guilty plea.

The waiver justice also heard the testimony of the director of the Rhode Island Training School, who described the programs and facilities available to the Family Court at the time of the Valente murder and discussed the difficulties in rehabilitation of juveniles when there is insufficient time before the juvenile reaches the age when release is required by law.

The defendant had objected to the admission of the testimony of the late Peter Gilbert given during defendant's trial and also to the admission of the Bureau of Criminal Investigation record regarding defendant's father. His objections were overruled.

■ The use of the prior recorded testimony of Gilbert was proper. Under Rule 804(b)(1) of the Rhode Island Rules of Evidence former testimony is a specific exception to the hearsay rule. The rule provides:

"(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.

(1) *Former Testimony*. Recorded testimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity [and similar motive] to develop the testimony by direct, cross, or redirect examination."

Certainly Gilbert was unavailable to testify at the waiver hearings that began on March 2, 1989, since he died on June 11, 1988, about nine months before the waiver hearings began. Furthermore defendant had the opportunity and similar motive to discredit the testimony of Gilbert at trial. Thus the requirements of Rule 804(b)(1) are met and the former testimony of Gilbert was admissible.

 In regard to the Bureau of Criminal Identification record on defendant's father, we would point out that it was very relevant evidence since one of the factors to be considered in a waiver hearing is the potential for rehabilitation. The defendant's father's situation and life style and defendant's home situation were important factors to be considered. There was no error in admitting that evidence.

 Reviewing the criteria that must be applied in these waiver cases, we think it most important first to consider the nature of the offense and the criminal method employed. The evidence, in our opinion, was of such a nature that it made the case one that should be seriously considered for waiver. Gilbert's testimony, which was confirmed in several particulars by the medical examiner's findings, established that the victim had been beaten about the head severely enough to cause bruises and contusions to the frontal lobes of the brain and hemorrhages both to the subdural space and to the subarachnoid space of the brain. There were also injuries to the face in the area of the lip. All these injuries were ante mortem, fresh injuries suffered just before death, and were caused by a fist or a hand. The medical examiner said that the head and face injuries could possibly have been caused by a rounded weapon like a baseball bat but that was doubtful in his opinion. The medical examiner also said that these head injuries would have prevented any purposeful movement by the victim. And while debilitated from these serious head injuries, Valente was thrown into the water from a bridge to drown. Drowning was in fact the ultimate cause of death. The victim's body was found washed ashore at Jamestown far from his home in West Warwick. There was testimony from a Jamestown resident that defendant, his confederate, and the victim had been seen together by him in Jamestown on more than one occasion. All things considered, Gilbert's testimony was corroborated by other evidence.

The death was unquestionably a homicide and not an accident. The means would indicate a homicidal intent that lasted a considerable length of time. This was not a crime of passion or impulse. It was a cold-blooded, calculated execution of a potential informer. In fact the manner in which this crime was committed would strongly suggest the perpetrator was a seasoned, mature, and hardened criminal.

There was strong evidence of motive. The victim had revealed to the West Warwick police that he had engaged in a theft of property with defendant. Because of this evidence of motive and the fact that the victim and defendant were known to have been together regularly, defendant was a suspect in the murder virtually from the day the victim's body was discovered.

The evidence defendant vigorously offered at the waiver hearing to impeach Gilbert's credibility would have tended to establish that Gilbert had not truthfully described his living situation when he testified for the state. The evidence offered for impeachment was information that came to public knowledge following Gilbert's sudden death while in the State of Connecticut while not in the custody of any law enforcement personnel and in circumstances that were bizarre, to say the least. Those circumstances would indicate that at some point Gilbert's custodial circumstances had become far different from, far less restricted than those he described to the jury. In fact Gilbert had apparently traveled out of state, alone, on more than

one occasion. However, the jury had already been informed not only that Gilbert was a convicted felon in Maine, Florida, and Massachusetts, had escaped from a Florida prison, and had violated conditions of probation several times, but also that on his arrest in Rhode Island he implicated himself in three murders and a robbery with which he had not previously been charged and had made an agreement with the authorities for a disposition of all those charges, which agreement was extremely favorable to him. In view of what the jury already knew about Gilbert, it seems highly unlikely that the new evidence would have so impeached his credibility with the jurors, that they would not have believed his testimony about defendant's admissions regarding the Valente murder. The impeaching evidence was more in the nature of cumulative evidence and would not really qualify as new evidence.

In any event the waiver-hearing justice was not required to decide defendant's guilt or innocence or evaluate Gilbert's entire testimony for credibility. Other courts have determined that the waiver of jurisdiction is not a final adjudication but is primarily a mechanism designed to protect the best interests of a juvenile and the public, *In re Joseph T.*, 575 A.2d 985, 986 (R.I. 1990); *In re Clay*, 246 N.W.2d 263 (Iowa 1976). To the same effect are holdings in *D.H. v. People*, 192 Colo. 542, 561 P.2d 5 (1977), and *State of New Jersey in the Interest of R.L.*, 202 N.J.Super. 410, 495 A.2d 172 (1985). It was the waiver justice's duty only to determine whether there was probable cause to believe that defendant had committed the offense in question. Probable cause could be found, in this instance, if there was evidence that, if believed by a jury, could support a verdict of guilty. And if probable cause was found, the waiver-hearing judge would then consider whether defendant was a good candidate for the rehabilitative services available for juvenile offenders or whether, all things considered, the juvenile was not a good candidate for such services and the need for protection of the public dictated that defendant be treated as an adult.

After reviewing the evidence presented, the waiver justice concluded that the murder itself had been brutal and premeditated. He concluded that confining the defendant for three years until his mandatory release at age twenty-one would be an insufficient amount of time to rehabilitate the accused. There was no evidence from which the waiver justice could reach a conclusion that the defendant would have cooperated with or would have been receptive to rehabilitation efforts. Any Family Court judge, he observed, would have had grave concern for the safety of the public when faced with the prospect of releasing this person. Assuming that the facts were true, he said that he found the alleged conduct "absolutely, positively, despicable." The trial justice concluded that any Family Court judge would have determined that there was sufficient probable cause to waive jurisdiction, relying on the evidence before him. We affirm his conclusion.

For these reasons the defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the papers of the case are remanded to the Superior Court.