Gerald S. MASTRACCHIO

v.

John MORAN.

No. 95–360–C.A.

Supreme Court of Rhode Island.

July 22, 1997.

Paula Lynch Hardiman, Asst. Public Defender, for Plaintiff.

Annie Goldberg, Aaron Weisman, Terrence P. Donnelly, Asst. Attys. General, for Defendant.

Before Weisberger, C.J., and Lederberg, Bourcier and Flanders, JJ.

## OPINION

BOURCIER, Justice

This case is before us on the state's appeal from a final judgment of the Superior Court granting Gerald S. Mastracchio's application for postconviction relief, vacating his previous conviction, and ordering a new trial. The state's appeal is pursuant to Gen.Laws 1956, § 10–9.1–9.

## I

### The Case Facts and Travel

On or about December 11 or 12, 1979, Richard Valente (Valente), a thirteen-year-old boy, was savagely beaten about his head and face, transported to the highest point on the old Jamestown Bridge, and tossed, while semiconscious, over the bridge railing and into the frigid waters of Narragansett Bay, some one hundred feet below. He drowned. Some two or three days later, on Sunday, December 15, 1979, his body washed up at the high-tide watermark on the west shore of the bay some three miles from the Jamestown Bridge. An autopsy established that although Valente had suffered severe facial and head injuries, he was alive when thrown from the Jamestown Bridge and that the cause of his death was homicide. That homicide or murder remained unsolved until some six years later. The events chronologically leading to the discovery of the murderer are pertinent to this appeal.

Sometime in 1978 Peter Gilbert (Gilbert), a local hoodlum and partner in various crimes with Gelardo Mastracchio (Gelardo),[1] left Rhode Island to live in Florida. While there, he resorted to his criminal ways and ended up in a Florida prison. He escaped from that prison sometime in early 1983 and fled to Chattanooga, Tennessee. In the summer of 1983, needing assistance, he telephoned his former partner in crime, Gelardo. He was told that he could return to Rhode Island and work for Gelardo, who told Gilbert that he was then engaged in a new business venture, selling narcotics. Gilbert came back to Rhode Island and took up his nefarious employment with Gelardo. Initially, upon his return, he actually lived with Gelardo and his family in a housing complex on Cowesett Avenue in West Warwick.

Gilbert, it should be noted, was no stranger to Gelardo's family. Prior to his having left Rhode Island in 1978 to live in Florida, Gilbert had "watched out" for Gelardo's family and had looked after their needs and paid for Gelardo's legal fees while Gelardo was imprisoned at the Adult Correctional Institutions. Gilbert and Gelardo's then-minor son, Gerald S. Mastracchio (Gerald), the applicant herein, had during that time become very close friends, and Gerald admired and trusted Gilbert. As a result of that past relationship, when Gilbert returned to Rhode Island in the summer of 1983 to work with Gelardo in his narcotics enterprise, Gilbert and young Gerald renewed their friendly relationship and actually worked together in the sale and distribution of narcotics for Gelardo.

Young Gerald was no stranger to the drugs that he was then helping Gilbert to distribute. He had in fact been "hooked" on heroin. During the time they spent together working for Gelardo, young Gerald began to talk and apparently to boast about his own criminal endeavors and achievements. In particular he told Gilbert about a murder that he had committed some years earlier along with another juvenile named Steven Dionne (Dionne), a murder that involved a thirteen-year-old boy who they had beaten and tossed over the Jamestown Bridge, a factual situation identical to the Valente murder and which the police later concluded was the Valente murder. Gilbert became agitated upon hearing Gerald talk of the murder and the intimate details related to its commission. He warned Gerald never to talk about it to anyone else. That warning went unheeded, however, and Gerald continued to talk, almost boasting of what he had done and for what reason and for what purpose. That purpose had been to "silence" Valente who had earlier, in November 1979, told the West Warwick police about various crimes in which Gerald and Dionne had been involved in the West Warwick area.

---

1. *Gelardo Mastracchio is the father of Gerald S.*  *Mastracchio.*

Gilbert was upset by Gerald's braggadocio but feared telling Gelardo of what his son was talking about. Gilbert soon learned, however, from Gelardo that Gelardo was already fully aware of his son's loquaciousness and was furious over it. Gelardo on one occasion was so upset by his son's continuous talk about the murder and over his own suspicions that his son was stealing heroin from him that one day he asked Gilbert to accompany him to Scarborough Beach where young Gerald was attending a house party and where Gelardo was going to lure his son away from the party and shoot him. Unbeknownst to Gelardo, Gilbert had removed the bullets from Gelardo's .38–caliber gun when Gelardo left the car to telephone Gerald and lure him from the house party. When Gerald responded to his father's phone call and was taken to the car, Gilbert immediately intervened and began talking to Gerald, cautioning him about the danger that he was creating for himself by his heroin habit and by his open conversations about the murder. In response Gerald attributed his conduct to his heroin habit and repentingly agreed to go for a heroin "cure." As a result the near-fatal confrontation between father and son never materialized and Gerald's near demise was avoided because of Gilbert's intervention. Little more was ever said thereafter of the Valente murder by Gerald. Later, Gelardo, in hopes of ensuring that his son would never be implicated by Dionne in the Valente murder, wanted Gilbert to kill Dionne who had participated in that murder with his son, but Gilbert declined to do so, citing a self-pronounced noble reluctance to kill "young kids."

Gilbert's employment and friendly relationship with Gelardo continued for some time thereafter at which time the relationship began to fall apart over noted shortages in Gelardo's narcotic-business inventories. Gilbert denied any responsibility for those shortages and blamed them instead on Gerald. Nonetheless, Gilbert remained the prime suspect. Gilbert, sensing Gelardo's growing mistrust and believing that Gelardo had recently orchestrated at least three attempts on his life, began to distance himself from Gelardo.

On February 28, 1985, the Gilbert and Gelardo union unraveled. On that day a confidential informant for the police relayed information to the Providence police that Gilbert was an escapee from a Florida prison and that he had a sawed-off shotgun in his home. An arrest and search warrant followed, and Gilbert's home was searched. No sawed-off shotgun was found, but the cache of narcotics that Gilbert was dealing for Gelardo was discovered in Gilbert's home, and Gilbert was arrested and charged with that possession. While being held at the Providence police station, Gilbert, true to what he referred to as the "code," refused to "turn over." In street parlance, that meant that he would not divulge the source of the narcotics, nor would he divulge whoever was involved with him concerning the narcotics but would instead "keep quiet," take all the blame, and do the time for the crime.

While being held at the police station, Gilbert asked to make a telephone call. He was permitted to do so, and sometime between 4 and 5 p.m., he telephoned his wife, who was at home. When he did, he learned from her that shortly after his arrest Gerald came to Gilbert's home and had requested that she and Gilbert's two daughters, aged three and six years old, come with him to an undisclosed location. Gilbert's wife told him that she was frightened by Gerald and suspected that something was amiss. She told Gerald that she would follow him along with one of her daughters in her own car. Gerald then proceeded to put Gilbert's six-year-old daughter into his car and drove away. Gilbert's wife followed in her car. She told Gilbert that while following Gerald her suspicions about Gerald's motives mounted, and upon observing a police car drive by, she signaled Gerald to pull over and stop by blinking her car's headlights. When Gerald did pull over, she went over to his car, pulled her daughter out of the car, and told Gerald that she believed the police were going to her home and that she wanted to return there to see what was happening.

When Gilbert learned of what Gerald had done, he immediately surmised that it was Gerald's father, Gelardo, who had "dropped the dime on him." Again, in street parlance,

this meant that Gelardo had given the Florida–prison–escape and the sawed-off-shotgun information to a known police informant, knowing that the informant would then carry the intentionally-planted information to the Providence police, who would then use the planted information to obtain an arrest warrant for Gilbert and a search warrant to search his home for the sawed-off shotgun. Failing to find any gun, the searchers would then of course find the cache of narcotics that Gilbert was dealing for Gelardo, and the "dime dropper's" mission would then be successfully accomplished. The so-called code apparently has its exceptions, and Gilbert was beginning to realize that not all of the code's advocates were loyal to it. He decided at that point to join the "unloyals." As he later told a grand jury panel, "I didn't owe any allegiance to those people, any loyalty. And I agreed for protection for my family and myself" to talk to the police. He was prepared now to "sing," and the police were eager to listen to the lyrics of the songs in his repertoire. A mutual chord was struck, and the police immediately dispatched a police guard to Gilbert's home to protect his family. The following day his wife and two children were taken into police custody, and Gilbert began talking to the police.

The information furnished to the police by Gilbert proved most valuable as well as credible. Some of it resulted in the discovery of the body of a person who originally had been believed to have been missing but who instead had been murdered. Other information led to the discovery in the Johnston Central Landfill of the dismembered body parts of another murder victim as well as to a liquor store robbery in Providence. Pertinent to this appeal, Gilbert, in March of 1985, told the police about a third murder. He told the police that he had been told by Gerald that he and another young man, Dionne, had some years earlier viciously beaten a young thirteen-year-old boy about the face and head and then, on a heavily fogged night, transported the victim to the highest part of the old Jamestown Bridge and that Gerald had gone on to describe in detail how, at that point on the bridge, he and his friend, Dionne, had taken the victim from their vehicle and, while he was still alive

and still "making sounds," tossed him over the bridge rail and down into Narragansett Bay. Gilbert told the police that Gerald had related to him how he and his friend actually watched the body fall into the bay, after which they drove away and Gerald returned home. Gilbert additionally informed the police that Gerald had told him that the reason the young boy had been beaten and tossed into the bay was to prevent him from ever telling the police again about various crimes that Gerald, Dionne, and the young boy had committed together. Gilbert also related to the police that Gerald had told him that the young victim had once been a close friend and good confidant, but that soon after having had a plastic plate inserted in his head as the result of a serious automobile accident, he had not been the "same." Upon hearing what Gilbert had related, the police discovered that the narrative fit exactly the intimate details surrounding the unsolved murder of Richard Valente, aged thirteen, which had occurred on or about December 11 or 12, 1979, and had resulted in the boy's body being washed up on the shores of Narragansett Bay on December 15, 1979. Valente's body, on the day it was discovered, revealed severe facial and head injuries, and his head did contain a plastic plate that had been surgically inserted in 1976 following an automobile-collision injury, just as Gilbert had described.

In November 1985 Gilbert repeated the same intimate details about the Valente murder to the Rhode Island State Police. In early December of 1985 he again related those same murder details that he had learned from Gerald to a grand jury. On December 4, 1985, that grand jury returned an indictment (P1/85–3173) against Gerald, charging him with the murder of Valente. Gerald was arraigned, pled not guilty, and after a bail hearing in December of 1985 was held without bail for trial. In March 1987 Gerald was tried before a jury and found guilty of the first-degree murder of Valente. He was sentenced to a mandatory life term at the Adult Correctional Institutions. Following his appeal in which his juvenile age at the time of the murder was an issue, this Court remanded the case to the Superior

Court for a de novo waiver hearing to determine whether, in the circumstances of the Valente murder, the Family Court would have waived jurisdiction pursuant to G.L. 1956 §§ 14–1–7 and 14–1–7.1 in order to enable Gerald to be tried as an adult in the Superior Court.[2] *State v. Mastracchio,* 546 A.2d 165 (R.I.1988). That opinion, however, otherwise affirmed Gerald's conviction with respect to all the other issues raised in his appeal.

A Superior Court justice, after conducting the de novo hearing as ordered in the remand order by this Court, determined that Family Court waiver was appropriate in the circumstances. Gerald's appeal from that decision was later denied. *State v. Mastracchio,* 605 A.2d 489 (R.I.1992).

It was during the pendency of the Superior Court de novo waiver hearing on September 22, 1989 that Gerald filed the instant application for postconviction relief. It was in great part based upon alleged newly discovered details concerning the nature of the police department's custody and confinement of Gilbert, the state's primary witness in Gerald's trial for murder, that had just been reported in the local press.[3] Gerald's application alleged that that newly discovered evidence demonstrated that Gilbert, in his testimony at Gerald's trial for murder, had misrepresented the conditions of his custody and that the state had failed to disclose all the rewards and inducements it had promised in exchange for Gilbert's testimony.[4]

## II

### The Standard of Review

■ Postconviction relief is available to individuals in this state pursuant to G.L.1956

chapter 9.1 of title 10, who, after conviction for a crime committed, claim *"inter alia,* that the conviction violated [his or her] constitutional rights or that newly discovered facts require vacation of the conviction in the interest of justice." *Palmigiano v. State,* 120 R.I. 402, 404, 387 A.2d 1382, 1384 (1978). Following a postconviction hearing, a trial justice's factual findings are entitled to great weight and will not be disturbed on appeal absent a showing that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *Doyle v. State,* 430 A.2d 416 (R.I.1981).

■ Since in this appeal the issue raised by Gerald's application for postconviction relief is whether the state's failure to inform Gerald or his counsel of all the details concerning Gilbert's custodial confinement violated Gerald's due process rights, review of the judgment entered on Gerald's application for postconviction relief involves mixed questions of law and fact that have an impact on constitutional matters. Accordingly, we will review the record de novo. As we said in *State v. Campbell,* 691 A.2d 564, 569 (R.I. 1997),

" '[a] policy of sweeping deference' [to the trial justice] could allow constitutional issues to be decided '[i]n the absence of any significant difference in the facts,' * * * [depending] 'on whether different trial judges draw general conclusions that the facts are sufficient or insufficient' to decide a constitutional issue. [*Ornelas v. United States,* 517 U.S. ——, ——, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911, 919 (1996) ]. The Supreme Court concluded that '[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles.' *Id.* "

2. Although Gerald was twenty-three years of age at the time of his jury trial, he was only seventeen years of age when Richard Valente was murdered.

3. Those details were revealed only after Gilbert's death in June 1988, which occurred in such unusual circumstances that an investigation of Gilbert's confinement followed soon thereafter, Gilbert died at a Connecticut gas station while he was on his way to a skydiving appointment in a car containing a substantial amount of cocaine. Gilbert was serving his sentences for murder at

that time in the custody of the Providence police by virtue of a previous Superior Court order intended to protect Gilbert from retaliation because of his cooperation with the state.

4. It should be noted that although Gerald's trial counsel did file a pretrial discovery request on December 19, 1985, in that request he failed to request any information from the state concerning any plea agreements, inducements, or rewards or promises made to Gilbert by the state in return for his cooperation and expected testimony.

■ After conducting our de novo review of the evidence in the record before us, we conclude that the evidence presented at the hearing on Gerald's application for postconviction relief was merely impeaching and cumulative, would not have affected, changed, or undermined, the trial jury's finding that Gilbert's testimony was credible, and in no conceivable manner impacted prejudicially upon the applicant's due process right to a fair trial.

## III

### The Postconviction Record

Gerald contended in his postconviction application that the prosecution had misrepresented the actual conditions of Gilbert's protected-witness police-custody confinement and that the state had failed to disclose all the rewards and inducements promised and provided in exchange for Gilbert's testimony. A Superior Court justice, at the conclusion of the hearing on Gerald's postconviction application, rejected Gerald's contention that the state had failed to disclose all of the rewards and inducements promised to Gilbert in exchange for his testimony. The hearing justice found that the post-conviction-hearing evidence did not support "any conclusion that the prosecution knowingly, or otherwise, withheld or concealed its true sentencing agreement with Gilbert" or that the prosecution knew that "Peter Gilbert perjured himself at these trials" when he testified as to the sentence the state had promised him in return for his cooperation as a witness.

The hearing justice did find, however, that Gilbert's testimony effectively served to conceal from Gerald and his trial counsel certain details of the conditions of his police-custody confinement that could have been construed by the trial jury as revealing a more lenient manner of custodial confinement than portrayed by Gilbert in his testimony to the jury and that as a result Gerald was denied a fair trial in violation of his right to due process.

The postconviction hearing justice's decision to vacate Gerald's jury-trial conviction that had been previously affirmed by this Court appears to be grounded upon a single portion of Gilbert's trial testimony that the hearing justice found to be both incomplete and misleading with regard to Gilbert's description of the nature of his police-custody confinement as a protected state's witness in several high-profile criminal cases about to be tried. We note from the hearing justice's decision that portion of Gilbert's jury-trial testimony and the justice's conclusion therefrom:

"In the Valente murder trial Peter Gilbert substantially parroted his earlier testimony about his custody during direct examination:

"Q. Would you explain the circumstances of your custody as this time?

"A. My family is kept in a undisclosed location in protection custody. Myself, I'm in a lockup situation, in the custody of the Providence Police Department. I have a 24–hour guard, seven days a week.

"Q. And describe the facility that you're in?

"A. I live in what could be described as a cellblock area. Bars on the window, there are three locked doors, successive locked doors, with a armed guard, and I have no access to the outside world or anything like that.

"Q. How many rooms do you stay in?

"A. Approximately three rooms that were turned into a living quarters sort of.

"Q. What do you have in those rooms:

"A. Basic furniture; a couch, a chair, a bed, a dresser for clothes. I have my own television, my own VCR which was my property; basic cooking utensils, a couple of pots and utensils, a refrigerator.

" * * *

"Q. And during the time that you are— how do you describe it, in a custody situation? How did you describe your confinement?

"A. I'm locked up.

"Q. In that three-room setting?

"A. I'm in a cellblock.

"Q. A three-room cellblock.

"A. A three-room cellblock with a couch and some chairs.

"A.  Please.

"Q.  With a couch?

"A.  I have got a couch, a chair, a bed.

"Q.  TV and VCR?

"A.  The same thing they get, minus the couch.

"Q.  The inmates get VCRs?

"A.  I know they have color TV.

"Q.  I'm asking about VCRs?

"A.  I don't know about that.

"Q.  You have your own stove and refrigerator?

"A.  Yeah, that was in the apartment.

"Q.  Would you agree that that is a rather generous result from your point of view?

"A.  Mr. Anderson.  I could tell you this, in two years I haven't had one night's sleep in two years.  I'm right there where they lock all the drugs up, all the drug addicts up, so if that's unusual—

"Q.  Let me put it this way, 10 years under those conditions, would you agree, is fairly generous given the charges pending against you?

"A.  I don't think the conditions I live under are generous at all; far from generous.

"Q.  More generous than 20 years?

"A.  Well, timewise.  I'm talking about the circumstances.

"  *   *   *   *

"On a brief redirect examination:

"Q.  During the testimony you said you were out—25 to 50 times you had been out to eat.

"A.  That was an approximation I gave in testimony.  They keep going back to it.

"Q.  Any of those times you went out alone?

"A.  Never, police offers (sic) all the time.

"Q.  You were never in the situation alone?

"A.  I have an armed guard 24 hours a day.

"  *   *   *   *

"All of this testimony conceals that from the Gasbarro robbery trial to the Valente murder trial Peter Gilbert had spent his time in Florida and in congenial hotels and that he relaxed learning to sky-dive."

Our de novo review of Gilbert's trial testimony along with the pertinent trial and post-conviction-hearing transcripts and case files leads us to conclude that the hearing justice, in passing upon Gilbert's credibility as a witness, erroneously considered the omitted details in Gilbert's recounting of the nature of his police custody as a monolithic whole rather than for their potential realistic value to the trial jury.  In light of the actual facts that Gilbert related to the trial jury concerning the murder of young Valente, which details Gilbert testified were told him by Gerald, we find that Gilbert's credibility with regard to those particular facts would not in any reasonable manner have been in the slightest way affected or impeached.  The hearing justice in his decision appears to have misconceived and misconstrued the real nature of the particular facts as related by Gilbert concerning the murder of Valente.  Those facts accurately described the motive that Gerald and his juvenile accomplice, Dionne, had for killing young Valente.  They described in accurate exact minute detail the parts of Valente's body that had been savagely beaten, the fact that Valente was alive and making sounds when his body was tossed into the Narragansett Bay, and that young Valente, because of an earlier automobile-accident injury, had had a plastic plate surgically implanted in his forehead.  They also described the portion of the Jamestown Bridge from which Valente's body was tossed.  If one bears in mind that Gilbert at the time of the Valente murder, was confined in a Florida prison, there is no conceivable way in which he could have learned of those minute, intimate, covert, and "for no other ears or eyes" crime-commission details unless he was actually present at the murder scene or had learned of them from the actual murderer.  Although Gilbert was in Florida and not present at the murder scene, Gerald was, and for that single reason Gerald was able to relate to Gilbert, why, when, where, and how the murder took place.  The very intimate, particularized nature of the murder

details related by Gerald could only be known to the perpetrator, and those details actually needed no real corroboration because they were self-corroborating. However, the trial jury did have before it testimony and evidence corroborating those details from the State Medical Examiner, whose testimony established as true Gilbert's account of where young Valente had been beaten, Gilbert's testimony that Valente was alive when thrown from the Jamestown Bridge, and Gilbert's testimony that Valente previously had had a plastic plate surgically implanted in his head following an automobile collision injury. The trial testimony from the Jamestown police concerning where Valente's body was found also served to corroborate Gilbert's testimony that Valente had been tossed from the Jamestown Bridge into the Narragansett Bay.

The hearing justice's finding that the trial jury, if it had known that Gilbert while in police protective custody had spent some time visiting with his wife and children in Florida, had been taken to hotels on some occasions to meet with state prosecutors in preparing for various trials, and had taken skydiving lessons, would have rejected Gilbert's detailed account of the Valente murder as related to him by Gerald is clearly erroneous.

## IV

### The Cumulative and Impeaching Evidence

■■■ "When addressing an application for postconviction relief, the trial justice applies the standard used for awarding a new trial. * * * This standard involves the application of a two-part test. To satisfy the first part, the threshold test, the trial justice must determine (1) if the newly discovered evidence actually is newly discovered or available only since the trial, (2) if the petitioner was diligent in attempt-

ing to discover the evidence for use at the original trial, (3) that the evidence is not merely cumulative or impeaching but is also material to the issue, and (4) that the evidence is of a kind that would probably change the verdict at a new trial." *McMaugh v. State,* 612 A.2d 725, 731 (R.I. 1992). *See also State v. Perry,* 667 A.2d 784 (R.I.1995).

Notwithstanding the fact that certain details of Gilbert's confinement were not revealed until after Gilbert's testimony at Gerald's trial, the Superior Court trial justice, we determine, erred in granting Gerald's application for postconviction relief because the evidence presented at the hearing on his application was merely cumulative and impeaching.[5] We agree with the state's contention here on appeal that:

"[t]he revelation that Gilbert's custodians occasionally tried to lift his spirits, during the two years he was locked up waiting to testify, separated from his family—that an armed contingent took him out now and then to eat in restaurants or to go for walks or shopping, even skydiving—was not evidence of a type to make a different result in this case reasonably probable."

The facts surrounding Gilbert's confinement that the trial justice found so compelling would in our judgment have nothing to do with the guilt or the innocence of Gerald. They would have merely challenged the credibility of Gilbert's testimony, which had already been thoroughly attacked and challenged by defense counsel, both during cross-examination of Gilbert and later in counsel's closing argument to the jury. Defense counsel, it should be noted, took full advantage of his opportunity to emphasize Gilbert's prior convictions, Gilbert's tendency to lie, and Gilbert's agreement or "deal" with the state given in return for his testimony.

Gerald's trial counsel fully exploited and challenged Gilbert's character and credibility

5. In addition, some of the evidence presented over the state's objection at the hearing on Gerald's application for postconviction relief was highly questionable. The trial justice presiding at the applicant's original trial for the murder of Richard Valente was not competent to testify as he did regarding what he would or would not

have done because he sat as a thirteenth juror in that trial, and someone sitting in the position of a juror is not competent to testify about what factors influenced his or her decision in rendering the verdict. *See R.I.R.Evid. 606(b); State v. Hartley,* 656 A.2d 954 (R.I.1995); *Palmigiano v. State,* 120 R.I. 402, 387 A.2d 1382 (1978).

before the trial jury for its credibility evaluation. Trial counsel brought out and told the jury of Gilbert's admission to committing three murders, to committing an armed robbery, to marrying three times, to lying to the women he married, to lying on one of his marriage applications, to being a bigamist and a burglar, to being guilty of fraud and theft, to defrauding insurance carriers, and to obtaining money under false pretenses. The jury was told that he also admitted to breaking his marriage vows. Additionally the jury was told that Gilbert was a liar, a perjurer, and a cocaine addict. The jury was also told that as his reward for testifying against Gerald and other high-profile criminals, the state was going to recommend favorable disposition on criminal charges pending against Gilbert in Florida, Maine, and Massachusetts, and for several of his yet-to-be prosecuted pending offenses in this state the state was going to recommend a fifty-year sentence with ten of those years actually to be served in prison. Despite knowing about all that criminal background and personal history, the trial jury nonetheless found Gilbert to be credible with regard to the testimony that he had given relating to what Gerald had admitted to him about the Valente murder. It is not reasonable to believe that if there had been added to that horrendous mix of criminal background and character evidence the fact that Gilbert's police custodians during the various trials in which he was being called upon to testify had permitted him short visits with his family, had taken him to eat in various restaurants, had taken him to several hotels where he could meet with his family or with prosecutors to discuss trial matters, or had permitted him to take skydiving lessons, the jury's findings or Gilbert's credibility would have in any appreciable way been altered. *See, e.g., Jacques v. State,* 669 A.2d 1124, 1144 (R.I.1995). In light of defense counsel's thorough exploitation of Gilbert's sordid past, none of the so-called newly discovered impeaching evidence elicited at the hearing on Gerald's application for postconviction relief was anything other than merely cumulative. *State v. Lanoue,* 117 R.I. 342, 366 A.2d 1158 (1976).

In *State v. Mastracchio,* 605 A.2d 489 (R.I. 1992), we noted that Gerald, in an attempt to discredit Gilbert's prior recorded testimony at his post-trial-waiver hearing, asserted essentially the same "new" evidence concerned in this appeal and we posed there a similar quantitative question as we do in this appeal. In that case this Court responded to its question by stating:

> "In view of what the jury already knew about Gilbert, it seems highly unlikely that the new evidence would have so impeached his credibility with the jurors, that they would not have believed his testimony about defendant's admissions regarding the Valente murder. The impeaching evidence was more in the nature of cumulative evidence and would not really qualify as new evidence." *Id.* at 494.

We persist in that belief. To do otherwise would be tantamount to our accepting a belief that if one were to paint one additional black stripe on a zebra, it would serve to disguise the zebra and conceal its identity as a zebra. We are not prone to accept that position.

## V

### The Custodial Facts—Materiality

Not only were the facts surrounding Gilbert's confinement cumulative and impeaching but they were also not material. In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the United States Supreme Court set forth the test to be applied when determining the materiality of evidence in postconviction proceedings attacking a prior conviction. The Court said that pursuant to its decision in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the

> "touchstone of materiality is a 'reasonable probability' of a different result * * *. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' * * * A

defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One * * * [must show] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 434–35, 115 S.Ct. at 1566, 131 L.Ed.2d at 506 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d at 491).

The trial justice hearing Gerald's application for postconviction relief, we note, recited the correct standard for determining the materiality of the alleged newly discovered evidence in his written opinion. However, he failed to apply that standard as set out in *Kyles* in that he concluded that, other than the testimony of Gilbert, which he discounted in light of the newly discovered evidence, there was insufficient evidence in the record to sustain Gerald's conviction.[6] As quoted above, the United States Supreme Court in *Kyles* specifically rejected that approach. The Court there held that the trial justice reviewing the evidence need not determine whether there was sufficient evidence to convict absent the discounted evidence but must instead determine whether the previously undisclosed favorable evidence puts the case in such a different light as to undermine confidence in the verdict.[7] *See also Lerner v. Moran,* 542 A.2d 1089, 1091–92 (R.I.1988). The evidence concerning Gilbert's confinement did not so undermine confidence in the trial jury's verdict.

Gilbert's credibility during Gerald's trial was more than significantly attacked. Defense counsel there emphasized, as we noted earlier, Gilbert's long and varied criminal history as well as his tendency to lie under oath. Defense counsel had also elicited for the trial jury that Gilbert had been taken out to eat some twenty-five to fifty times during his police-custody confinement. Admittedly, defense counsel was also aware of other details about Gilbert's custodial confinement learned from his attendance at pretrial hearings in the unrelated *State v. Broccoli* and *State v. Mastrofine,* C.A. no. P1/86–580, cases. Those details included Gilbert's month-long stay at a safe house in Narragansett and Gilbert's conjugal visits with his wife. Defense counsel, however, intentionally chose not to bring out that evidence at Gerald's murder trial.

We conclude in light of the self-corroborating nature of the testimony given by Gilbert to the jury at Gerald's trial, and the exposure to the jury by defense counsel of Gilbert's criminal and personal background, that the so-called posttrial newly discovered evidence relating to Gilbert's activities while in police custody, even if known to the trial jury, would not have in any circumstance created a reasonable probability that the jury's verdict would have been any different. Although it is clear that knowledge of Gilbert's skydiving lessons did not surface until after the trial and after Gilbert's death, there appears to be no valid reason advanced other than trial strategy as to why defense counsel at trial could not have questioned Gilbert about what he did while in police custody and what activities he engaged in when he was not confined to his police-station apartment. Defense counsel was aware of the moneys paid to Gilbert by the state and had been given ledger sheets concerning those funds. In addition defense counsel had sat through the entire voir dire of Gilbert when he was thoroughly examined by other counsel in the Gasbarro robbery case, a case that was based in great part on Gilbert's testimony as a

---

**6.** It should be noted that at the time of the trial justice's decision he did not have the benefit of the decision in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

**7.** We acknowledge that the Court in *Kyles* was addressing the situation where sufficient evidence exists to convict other than the discounted evidence but where the previously undisclosed evidence favorable to the defendant undermined confidence in the verdict. That was not the conclusion reached by the trial justice below. However, the ultimate conclusion in *Kyles* was that the sufficiency or insufficiency of the inculpatory evidence other than the discounted evidence is irrelevant, and the only relevant inquiry is whether the previously undisclosed favorable evidence undermines confidence in the verdict.

state's witness. Defense counsel had received a transcript of that voir dire hearing. Defense counsel, Dale Anderson (Anderson), admitted that he was also aware, prior to Gerald's trial, that Gilbert, while in police-custody confinement, had access to a telephone, had consumed beer in his quarters, had visited his wife for conjugal visits, had gone out with his wife for an anniversary dinner, had visited with his wife and family for some "30 days around the holidays in 1986," had visited with his wife at the Holiday Inn, had gone out to eat dinner some "25 to 50 times," had traveled to Florida twice, had used drugs, had earned between $4,000 to $10,000 per week selling drugs for Gerald's father, had committed perjury in 1976, and had collected welfare payments while in police custody. Yet despite knowing all those facts, Anderson chose not to question Gilbert about any of those matters during Gerald's trial. Anderson later testified at Gerald's postconviction hearing about what his trial strategy had been as well as his reasons for not delving into the nature and details of Gilbert's police-custody confinement. He stated:

"A. As a result of the Gasbarro voir dire, I concluded it would be a waste of time to cross-examine Gilbert virtually at all as to the material conditions of his life, his lifestyle, so to speak. He had said, and I had no reason to dispute his testimony, that he was locked up 24 hours a day, any time a lawyer in the Gasbarro voir dire tried to suggest there was any—tried to question him about that, he just complained. He said it was, in fact, worse than what the inmates at the ACI had to undergo.

"Insofar as monetary benefits went, there was nothing to use there either, because he had no access to the money, and if you asked him about that, you got a sob story about his family, most of it went to his family. So that going into the Mastracchio trial, I had no intention of cross-examining Gilbert about conditions of his life, his lifestyle, so to speak, or for that matter, about the monetary benefits he was receiving. The out to dinner 25 to 50 times, I didn't ask about that. It seemed a little picky, and I purposely decided not to impeach him on those lines and instead concentrated on the generous plea bargain he was able to receive for the crimes he committed.

"To further answer your question, it seemed to me that [the] way this testimony was presented in front of a jury, the conditions of his life were received and given in a way such as to bolster his credibility, rather than detract from it. It came out on Direct, and I didn't want to further bolster his credibility by reiterating the terrible conditions he was living under.

"* * *

"A. My answer—I did not question Peter Gilbert in general about his relations with his wife, I think for several reasons. I thought that his answer—I risked his answers created sympathy for himself as a witness who was separated from his wife and family, and it would—in the context of that trial, it would tend to give him another opportunity to emphasize how severe the constraints were on his liberty, how tight the custody arrangements were. I also—to put it in the more colloquial, I didn't want this jury to think he was some kind of a family man. And, in fact, I made a point of cross-examining him to show that he had been married more times that he could remember, to show that he had children out there that he had nothing to do with, and since these marriages elapsed he had lied to preachers and notary publics and prior wives. I didn't want the jury to focus on his estrangement with his present family.

"* * *

"Q. Prior to Mr. Gilbert testifying at the Mastracchio trial, were you aware that he had perjured himself in testimony before a jury in a 1976 trial?

"A. I was aware that he—that is, Gilbert, was claiming that he had committed perjury in 1976. Whether he did or not, I suppose, it is kind of hard to know for sure.

"* * *

"A. But I was aware that he was claiming to have committed perjury back then.

"Q. And you did not disclose or ask him about that before the Mastracchio jury; is that correct?

"A. Right, for two reasons. (One) As I said, you could have suggested just about any crime in the world, he would have admitted having committed that before he became a witness and turned his life around. The additional reason is that the perjury he claimed to have committed involved a hearing involving my client's father, and the jury would have heard the context in which that perjury came out. It involved a hearing on Mr. Mastracchio's father's application for post-conviction relief, and I didn't want the jury to hear that my client's father had once—was once seeking release from imprisonment. Do you follow me?

"Q. Right, I think I do. Did you consider filing a Motion in Limine to limit the testimony?

"A. That's a good idea, it didn't occur to me. I did not file such a motion. I don't think that standing alone was worth that much effort, that is, the admission by Gilbert was that he committed perjury. I think it was more of a surprise to Gilbert to confront him with the lie—the false statements that he made connected with all of his marriages.

"Q. One more matter. At the Gasbarro trial Mr. Gilbert said that he had made two trips to Florida, and I'm just curious if you had noticed that in his testimony he said he went once for Court, and, to my understanding of the transcript, nobody ever followed up and said, "What was the second trip for"?

"A. You know, you have a sharper view of this in hindsight.

" * * *

"Q. * * *Did you ask, 'Did you leave your place of custody?'

"A. I didn't think of that, I just didn't think of asking that.

"Q. Sure. You did ask about the 25 to 50 visits to restaurants, and then moved on, I believe, rather quickly. Did you consider inquiring as to what kind of restaurants Mr. Gilbert went to?

"A. If I had been a party to that voir dire, I might have done it then, but since I was not, I didn't know what kind of answers he was going to give, and I wasn't going to find out for the first time in front of the jury, so, no, I didn't.

"Q. And can we agree that you could have asked for your own voir dire but did not?

"A. That's correct.

"Q. Having the benefit of hindsight as I do, I think, Mr. Anderson, in reviewing your cross-examination of Mr. Gilbert at the Mastracchio, Valente trial, I think you've already testified, you spent some considerable time in cross-examining Mr. Gilbert as to his history with wives and such. Could you explain what your purpose or strategy was in doing that?

"A. Yes. I had documents, so I knew I could prove the answer. The documents included statements that said they were made under oath. They were false as to, 'This is my second marriage,' for example, when, in fact, it was his third or fourth. I thought that, therefore, I could prove he made false statements under oath in writing, that also I could establish that at least once, I think twice, he didn't bother to divorce the last wife before he married the next one, so that the marriage vow was itself false. I thought that disclosing to a jury that this witness would enter into a false marriage vow and give a false statement under oath would detract from his credibility.

"Q. And not only did you think you could prove it, you did prove that he lied on documents under oath; do you recall?

"A. He admitted that the documents were authentic, and he—his response, as I recall, it was something to the effect of, that was the least of my crimes, you know, yeah, I made a false statement.

"Q. And if I understand your strategy correctly, you disagreed with Mr. Gilbert that his violation of so important and sacred an oath, really was something that you felt the jury would be deeply influenced by?

"A. I hoped so. I hoped the jury would have been influenced by that. In hind-

sight, I think I didn't carry it as far as I should have. To this day I'm curious whether he was married to more than one woman at the day he testified.

"Q. Do you recall his testifying toward the end of your cross-examination on this topic, 'I live a fast life, the life of a criminal'?

"A. Yes, I do. But, again, if I had followed it up, he was claiming he was no longer a criminal. I would have liked to have known—I should have pursued what his—exact marriage status was at the time of his testimony."

Gilbert's testimony, notwithstanding the undisclosed circumstances of his confinement, we conclude, was completely consistent with at least three prior statements given by him in 1985 before his witness-sentence agreement with the state and before the occurrence of the alleged abuses of Gilbert's confinement. On November 20, 1985, Gilbert gave a recorded statement to two members of the Rhode Island State Police in which he explained that Gerald had told him how he and a friend had murdered Valente. Gilbert recited the same facts later at Gerald's trial.

In December 1985, Gilbert also testified before a grand jury about how Gerald had confessed to him about the murder of Valente. In that testimony he explained in detail how Gerald had told him that he and Dionne had beaten Valente in the head and had later dumped Valente's body over the rail of the Jamestown Bridge.

On December 12, 1985, at Gerald's bail hearing, Gilbert again testified about Gerald's admissions regarding the Valente murder. In his testimony at that hearing, Gilbert testified that Gerald had told him that Valente had had a plate in his head from an automobile accident and that he would have liked to have "cultivated" Valente because he was supposed to have received a large amount of money from that accident. Gilbert also testified that after Gerald and his friend had savagely beaten Valente on the head and face, they heard Valente make some noises and they believed that he was still alive when they threw him over the rail of the Jamestown Bridge and into Narragansett Bay.

There was also testimony presented at the hearing on Gerald's application for postconviction relief that indicated that Gilbert had made other unrecorded statements to the Providence police and to the prosecutor that were consistent with the recorded statements discussed above.

Additionally, contrary to the suggestion implicit in Gerald's postconviction assertions regarding the plea and witness agreement Gilbert had entered into with the state, there was no evidence presented that in any way indicated that in return for successful trial testimony Gilbert would be granted the liberal conditions of confinement that were brought out at the hearing on Gerald's application for postconviction relief. In short, there was no tie-in or connection between the two. The state's plea and witness agreement with Gilbert only promised that in return for his testimony he would receive a more lenient sentence than he would have received otherwise, a fact that was thoroughly exploited both on cross-examination and in defense counsel's closing argument at Gerald's jury trial. There was absolutely no evidence presented to support Gerald's contention that Gilbert was at any time under the belief that his trial testimony for the state could result in his being granted additional privileges during custodial confinement and that, as a result, he would lie in order to ensure more favorable treatment.

■ Accordingly, for all the reasons discussed above, we conclude that the so-called previously undisclosed evidence that Gerald asserts serves to destroy the credibility of Gilbert's trial testimony is simply wishful exaggeration. We do not have here a *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), factual situation where discovery was requested and withheld. Neither do we have a *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), factual situation wherein the prosecutor could be found to have been negligent in failing to discover and make known, for example, Gilbert's skydiving antics during police-custody confinement. What we do have instead is simply a factual situation where, as the hearing justice found, the prosecution

was innocent of any wrongdoing and negligence in not informing or being able to inform defense counsel of the several facts concerning Gilbert's custodial confinement that came to public attention shortly after Gilbert's unexpected death, long after the jury trial. In that fact scenario this Court, even after *Brady* but before *Kyles,* noted that when posttrial evidence surfaces, that the defense in hindsight believes could have been helpful during the trial, the defense, in order to obtain relief from the jury's verdict, although not required to show the probability of a different verdict upon retrial, is required to show that there would be significant chance that the use and development of the posttrial discovered evidence would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction. *See In re Ouimette,* 115 R.I. 169, 342 A.2d 250 (1975). That "significant chance" rule as announced in *In re Ouimette,* 115 R.I. at 179–80, 342 A.2d at 254–55, reapplied here, would not in any manner support a conclusion on the record before us that Gerald is entitled to a new trial or, under *Kyles,* that the undisclosed facts would in any legal sense be sufficiently material so as to serve to undermine confidence in the trial jury's verdict or raise any reasonable probability that the verdict would have been different. Therefore, the hearing justice's reliance upon that posttrial discovered and unrequested evidence in granting Gerald's motion for a new trial was unwarranted and erroneous.

## VI

### The Asserted Perjury

Gerald also asserts before us that Gilbert's testimony given at his jury trial was perjurious. He claims that Gilbert, in his answers to the questions posed to him, deceptively did not elaborate on all the nuances of the terms of his confinement. Our review of the trial record convinces us that although Gilbert did not go out of his way to explain all the minute details of his custodial confinement while at the Providence police station, he did in fact answer directly the questions as posed to him by defense counsel. On neither direct nor cross-examination was Gilbert ever asked about any hotel stays, vacations to Florida, or other recreational trips as noted earlier. When asked to explain the circumstances of his confinement, he discussed the three-room apartment he stayed in at the Providence police station. He was not specifically asked about any of the times he stayed away from that apartment or what he did or where he went when not there. Thus, even though his testimony might have been somewhat misleading, it did not amount to perjury. *See Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973); *State v. Ouimette,* 415 A.2d 1052, 1054 (R.I.1980) ("In *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the Court makes clear that a defendant's responses to questions, if literally true even though perhaps shrewdly misleading are not perjurious").

■ Furthermore, there is no evidence that the unrequested and later-discovered facts were deliberately withheld by the prosecution. The trial justice specifically found that the prosecution did not deliberately withhold any of the so-called newly discovered evidence facts from defense counsel and we agree with that finding. Thus, this is not as Gerald asserts the easy case wherein automatic reversal is warranted. *Lerner,* 542 A.2d at 1092. Even if we were to conclude that Gilbert's trial testimony had in fact been perjurious, we would still need to perform a *Kyles* type of analysis, as discussed in part V above, in order to determine the materiality of the evidence not completely revealed through Gilbert's testimony at Gerald's trial for murder. *Id.* Because we have previously determined that the later-discovered evidence was not material and was merely cumulative and impeaching, none of Gilbert's testimony, perjurious or not, would warrant the trial justice's grant of a new trial on Gerald's application for postconviction relief.

## VII

### Conclusion

For all the above reasons, the state's appeal is sustained. The final judgment of the Superior Court granting a new trial is vacated. The bail set by the Superior Court

following the entry of that final judgment is hereby vacated.

Gerald Mastracchio is ordered to be immediately remanded to the Adult Correctional Institutions to resume serving the sentence previously imposed following his trial and conviction that we have previously affirmed. The papers in this case are remanded to the Superior Court with directions to enter final judgment in accordance with this opinion.

Goldberg, J., did not participate.