# United States Court of Appeals
## For the First Circuit

No. 00-2558

GERALD S. MASTRACCHIO,
Petitioner, Appellant,

v.

GEORGE VOSE, DIRECTOR, DEP'T OF CORRECTIONS,
STATE OF RHODE ISLAND,
Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Selya, Circuit Judge,

Gibson,* Senior Circuit Judge,

and Lipez, Circuit Judge.

Paula Lynch Hardiman, Assistant Public Defender, for petitioner.
Annie Goldberg, Assistant Attorney General, with whom Sheldon Whitehouse, Attorney General, was on brief, for respondent.

December 27, 2001

_____
*Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

**SELYA, Circuit Judge.** Asserting that the prosecution failed to divulge the full extent of special favors showered upon its star witness, petitioner-appellant Gerald S. Mastracchio, a state prisoner, unsuccessfully sought a writ of habeas corpus in the United States District Court for the District of Rhode Island. The petitioner now appeals that court's order of dismissal. Although the state court did err in three respects and the petitioner's arguments are ably presented, we nonetheless find that these errors are not of a magnitude that would warrant federal habeas relief. We therefore affirm the order of dismissal.

## I.   BACKGROUND

Our factual account derives primarily from the copious records of prior court proceedings. Readers who hunger for additional facts should consult the trio of earlier opinions authored by the Rhode Island Supreme Court. See State v. Mastracchio, 546 A.2d 165 (R.I. 1988) (rejecting most grounds of petitioner's direct appeal but remanding for determination anent Family Court's waiver of jurisdiction), aff'd after remand, 605 A.2d 489 (R.I. 1992); Mastracchio v. Moran, 698 A.2d 706 (R.I. 1997) (rejecting petitioner's application for post-conviction relief).

On December 15, 1979, the lifeless body of thirteen-year-old Richard Valente washed ashore on a beach bordering Narragansett Bay. An autopsy revealed that Valente had been badly beaten, but that drowning caused his death. The autopsy further revealed that a plastic plate had been inserted into his head some time prior to his demise.

A few weeks earlier the police had caught Valente engaging in petty larceny, and he had laid blame on the petitioner (then age seventeen). Armed with this knowledge and with a witness who had seen the petitioner in Valente's company several days before the body surfaced, the police launched an investigation. When the investigating officers were unable to tie the petitioner to the slaying, the investigation stalled.

While these events were transpiring, Peter Gilbert, a career criminal, was incarcerated in Florida. He escaped in 1983 and eventually telephoned the petitioner's father, Gelardo Mastracchio (Gelardo). Gelardo, a notorious organized crime figure, invited Gilbert to return home and partake of various illicit enterprises. Gilbert accepted this invitation and surreptitiously repaired to Rhode Island. He remained in Gelardo's employ until the authorities arrested him in February of 1985. Sensing that Gelardo had a hand in his capture, Gilbert agreed to assist the authorities.

Gilbert's cooperation proved fruitful, shedding light on numerous unsolved crimes. Of particular interest here, he told the state police that the petitioner had bragged about killing a friend by beating him, transporting him to the Jamestown Bridge, and throwing him over while still alive. Although Gilbert did not know the victim's identity, he quoted the petitioner as saying (i) that he had committed the murder to prevent his victim from talking to the authorities, and (ii) that his victim had never been the same since he had a plastic plate inserted into his skull following an automobile accident. This testimony filled the gaps in the dormant investigation, and a state grand jury soon indicted the petitioner for Valente's murder.

Gilbert remained in the protective custody of the Providence police department from and after the time that he began to warble. During his debriefing, he implicated James Broccoli and Lawrence Mastrofine in the robbery of a liquor store. Shortly before their trial, he testified in a voir dire hearing regarding the promises, rewards, and inducements given to him in exchange for his cooperation. The testimony revealed a variety of benefits received by Gilbert including payment of personal expenses averaging $1,500-$1,800 per month, a thirty-day stay with his family during the holidays, conjugal visits at

a local motel, twenty-five to fifty excursions to restaurants, easy access to alcohol throughout the course of his custody, and unlimited telephone privileges.

Gilbert was vigorously cross-questioned by defense counsel about these matters and about the conditions of his confinement.  He was less than forthcoming.  A representative sampling of the cross-examination follows:

>Q.  You pay for that food?
>
>A.  Yes.  Someone goes shopping and gets groceries.
>
>Q.  You give them the money?
>
>A. I don't give them the money, the Attorney General's Office gives them the money.
>
>Q.  You sure that comes out of the fifteen or eighteen hundred?
>
>A.  I don't see the money.  When I need groceries the money is made available to buy groceries.
>
>. . . .
>
>Q.  Have you been provided with any types of rules and regulations, either verbally or in writing, concerning your conditions of confinement while in the custody of the Providence Police, things you can do and things you cannot do?
>
>A.  What I can do is pretty much limited. I'm locked up.  I got cell bars in the window.  I — two doors — three doors that are locked.  I'm confined to a three-room area. That's my exercise.  I don't have no exercise yards.

-6-

. . . .

Q.  All you do is just live from day to day and week to week and month to month and you get your food and clothing, you get your haircuts and glasses, and then someone tells you that is costing them between fifteen hundred and eighteen hundred dollars a month; is that fair to say?

A.  Sure.

. . . .

Q.  Besides the thirty dollars a week that you're given by welfare do you receive any other cash from either the Providence Police or the Attorney General's Department for spending money?

A.  No.

. . . .

Q.  Is that what you told the Attorney General, you don't have an [sic] drug problem?

A.  No.  I used cocaine when I was on the street, but I have no drug problem.  I took care of it myself within my own mind and body.  I'm no longer dependent or need any of that stuff.  I haven't had it for twenty-three months.

. . . .

Q.  . . . .  Did you take any trips or have you taken any trips while you have been in the custody of the Providence Police?

A.  Yeah. . . .  I went to Florida.  I went to Florida to go to court.

. . . .

-7-

Q. In addition, to Florida and Maine has there been any other?

A. No. All I can remember is going to Florida twice and Maine once.

The voir dire hearing took place on January 9, 1997. The petitioner's trial began approximately two months later. Gilbert's testimony was essential to the prosecution's case; he, and he alone, placed the petitioner at the murder scene. The petitioner's trial counsel, Dale Anderson, was fully apprised of what had transpired at the Broccoli/Mastrofine voir dire hearing, and the prosecutor anticipated a full-blown attack on Gilbert's credibility. He attempted to blunt the force of this attack by delineating, in his case in chief, the range of benefits that Gilbert had received. To that end, the following exchange occurred during Gilbert's direct examination.

Q. Of the fifteen to eighteen hundred dollars you get per month, do you see any of that cash, physically, yourself?

A. No, I don't get it. Whatever bills are incurred are paid from that.

. . . .

Q. Would you explain the circumstances of your custody at this time?

A. My family is kept in a [sic] undisclosed location in protective custody. Myself, I'm in a lockup situation, in the custody of the Providence Police Department. I have a 24-hour guard, seven days a week.

Q. And describe the facility that you're in?

A. I live in what could be described as a cellblock area. Bars on the window, there are three locked doors, successive locked doors, with a [sic] armed guard, and I have no access to the outside world or anything like that.

As expected, Anderson mounted a vigorous challenge to Gilbert's credibility. In cross-examination, he relied heavily on the Broccoli/Mastrofine voir dire transcript. Anderson asked Gilbert about the conditions of his confinement, his checkered past (a sorry record that included murder, armed robbery, fraud, and burglary), and his well-documented penchant for prevarication. Anderson also inquired about Gilbert's affinity for narcotics, but Gilbert denied having used drugs since his arrest two years earlier.

On March 19, 1987, the jury found the petitioner guilty of Valente's murder. He was sentenced to life imprisonment. In contrast, Gilbert received what amounted to a ten-year incarcerative sentence (i.e., a nominal fifty-year sentence, with forty years suspended) for his myriad offenses, to be served in the protective custody of the Providence police department.

On June 11, 1988, Gilbert was still serving his sentence. On that date, he died from a heart attack that

occurred while he was driving unaccompanied to a skydiving lesson. Because of the exotic purpose of the sojourn, the absence of any police escort, and the presence of cocaine in the vehicle, this incident touched off a furor concerning the nature of Gilbert's confinement. A spate of investigations revealed that Gilbert's jailers had permitted him to take extraordinary liberties both before and after the petitioner's trial. Many of these special favors had not been disclosed to the petitioner, including, inter alia, the receipt of sums of cash ($20,000 over the course of the six months immediately preceding the petitioner's trial), regular access to marijuana, free passage through the corridors of the police station (including use of the halls for roller-skating and access to the roof), use of a municipal courtroom for exercise, travel to Florida to see his family on two additional undisclosed occasions,[1] use of the state attorney general's office as a reference on a loan application, and the aforementioned skydiving lessons.

Spurred by these revelations, the petitioner filed an application for post-conviction relief in the state superior court. See R.I. Gen. Laws § 10-19.1-1. Following a lengthy

---

[1] During the Broccoli/Mastrofine voir dire, Gilbert testified that he twice went to Florida to dispose of pending criminal charges. In point of fact, he journeyed there on two other occasions — once before the voir dire — to see his family and buy a car.

evidentiary hearing, the hearing justice found that the state did not fully and accurately disclose either the conditions of Gilbert's confinement or the nature of the payments made to him. The hearing justice imputed knowledge of these omissions to the prosecution because the underlying facts were reasonably well known to the witness protection team (i.e., the officers in charge of Peter Gilbert during his detention), who were in fairly regular communication with the prosecutor. Concluding that this undisclosed information was material, the hearing justice vacated the conviction and ordered a new trial.

The petitioner's victory proved short-lived. On appeal, the state supreme court reinstated the conviction. It concluded that defense counsel had sufficient opportunity to learn the true facts, Mastracchio v. Moran, 698 A.2d at 715-16; and that, in all events, "the prosecution was innocent of any wrongdoing and negligence in not informing . . . defense counsel" of the peculiar nature of Gilbert's custodial arrangements, id. at 718-19. As an alternative ground of decision, the court concluded that Gilbert's detailed testimony concerning Valente's murder "would not . . . have been in the slightest way affected or impeached" by the additional evidence. Id. at 712-13. In reaching this conclusion, the court described the newly emergent information as merely "cumulative and

impeaching," id. at 713-14, such that its existence did not undermine confidence in the verdict, id. at 715.

The United States Supreme Court refused to review this decision, see 522 U.S. 1123 (1998), and the petitioner ventured to the federal district court in search of habeas relief. The matter was referred to a magistrate judge, see Fed. R. Civ. P. 72(b), who recommended denial of the petition. See Mastracchio v. Vose, C.A. No. 98-372 (D.R.I. Mar. 15, 2000) (unpublished). The district court subsequently adopted the magistrate judge's report and recommendation. This appeal followed.

## II. THE HABEAS STANDARD

We review this appeal under the standards imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1218 (1996), and in particular by that portion of the AEDPA codified at 28 U.S.C. § 2254(d) (1996). This statute permits federal courts to issue a writ of habeas corpus at the behest of a state prisoner if the underlying state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

-12-

Id.

In applying these provisions, we do not write on a pristine page.  We first addressed the AEDPA standard in O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998).  There, we determined that this statute requires a federal habeas court first to assess whether the state court acted contrary to a legal rule prescribed by the Supreme Court.  Id. at 24.  We held that if the state court correctly identified the controlling rule and acted in accordance with it (or, alternatively, if no controlling rule exists), the federal court then proceeds to determine "whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent."  Id.

In a later case, the Supreme Court spoke authoritatively to the same general set of questions.  See Williams v. Taylor, 529 U.S. 362, 402 (2000).  In Williams v. Matesanz, 230 F.3d 421, 424 (1st Cir. 2000), we noted that O'Brien and Taylor were fully consistent.  We then synthesized these precedents, explaining that section 2254(d)(1) creates two classes of covered cases:  "the first category embraces cases in which a state court decision directly contravenes Supreme Court precedent, and the second embraces cases in which a state court decision, although not 'contrary to' relevant Supreme Court

-13-

precedent, nonetheless constitutes an 'unreasonable application' of relevant Supreme Court precedent."  Id.  We added that a state court decision would be contrary to clearly established Supreme Court precedent if that decision applies a rule that contradicts a rule clearly articulated by the Supreme Court or if the state court confronts a set of facts that are materially indistinguishable from an earlier Supreme Court decision, yet arrives at a result that differs from that precedent.  Id. at 424-25 (citing Taylor, 529 U.S. at 406).  Thus,

> the key inquiry . . . is whether a Supreme Court rule — by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations — can fairly be said to require a particular result in a particular case.

O'Brien, 145 F.3d at 25.

In respect to the second prong of the model established by section 2254(d)(1), we explained that "federal habeas relief may lie in favor of a state prisoner when a state court correctly identifies the applicable federal rule but applies it in an unreasonable manner to the facts of a particular case." Matesanz, 230 F.3d at 425.  We then added:

> This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively

-14-

> reasonable. . . . [T]he mere fact that some fair-minded judges might find a particular outcome unreasonable does not warrant relief. Nor does the existence of error, in and of itself: there is, for this purpose, an important distinction between unreasonable applications and incorrect applications.

Id. (citations and internal quotation marks omitted). Refined to bare essence, a state court decision is objectively unreasonable only if it "falls outside the universe of plausible, credible outcomes." Id. (quoting O'Brien, 145 F.3d at 25).

Federal habeas review of a state court's factual findings is similarly constrained. A habeas petitioner can overcome such findings only by demonstrating that they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Of course, these words must be interpreted in light of twin congressional directives that "a determination of a factual issue made by a State court shall be presumed to be correct," and that an applicant for a writ of habeas corpus "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Under this regime, a federal habeas court ordinarily refrains from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to

-15-

repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review." <u>Sanna</u> v. <u>DiPaolo</u>, 265 F.3d 1, 10 (1st Cir. 2001). A habeas petitioner therefore must clear a high hurdle before a federal court will set aside any of the state court's factual findings.

## III. ANALYSIS

Within the AEDPA framework, the petitioner asserts three general claims of error. First, he asseverates that the state supreme court unreasonably concluded that his defense counsel knew or should have known of the cash payments and the conditions of confinement. Second, he maintains that the court erred when it refused to impute knowledge of these facts to the prosecutor. Third, he faults the court for deeming the undisclosed evidence immaterial to the jury's assessment of Gilbert's credibility.

### A. <u>The Lack of Full Disclosure</u>.

We will assume without extended analysis that the petitioner prevails on the first of these arguments – his asseveration that the entire gamut of the special favors afforded to Gilbert was not fully revealed to the defense prior to trial. While Anderson had knowledge from the Broccoli/Mastrofine voir dire of many of these benefices (e.g., twenty-five to fifty jaunts to fancy restaurants, the occasional

-16-

presence of alcohol in Gilbert's cell, a prolonged "off-campus" visit by Gilbert with his family), it seems fairly clear that the state did not provide complete information about either the dazzling array of liberties that Gilbert enjoyed or the range of perquisites that he received. The state supreme court acknowledged the lack of disclosure to some extent, see Mastracchio v. Moran, 698 A.2d at 713 (agreeing that "certain details of Gilbert's confinement were not revealed until after Gilbert's testimony at [the petitioner's] trial"), but nonetheless found that the petitioner had sufficient overall knowledge of the largesse extended to Gilbert. To justify this conclusion, the court pointed to the disclosures made before trial (including the contents of the Broccoli/Mastrofine voir dire transcript and a ledger sheet reflecting monies given to Gilbert). Id. at 715-16.

There is, however, a wealth of information pointing in the opposite direction, much of it unearthed during the several investigations that followed Gilbert's death. Taken in the aggregate, we think that this evidence shows beyond hope of contradiction that Gilbert was treated more favorably than the defense was led to believe.

We need not belabor the point. Certainly, Gilbert's guarded responses at the voir dire hearing hinted broadly at an

unorthodox relationship with his jailers, but those responses, fairly read, did not illuminate the full range of benefits that he received from the state. To the contrary, Gilbert perjured himself when he denied receiving large sums of cash, see infra Part III(B), and he minimized the liberties available to him at every turn. The ledger sheet alluded to by the state supreme court did not bridge these gaps. It antedated Gilbert's trial by more than a year — and Gilbert apparently pocketed the largest sums of cash during that intervening period. In all events, the ledger sheet was little more than a series of scribbled numbers listed under two columns ("paid" and "unpaid"); the petitioner (or his trial counsel, for that matter) would have had to possess Delphic powers to divine from those hieroglyphics the purport that the state now ascribes to them. The short of it is that notwithstanding the high degree of deference that section 2254(d)(2) demands, the record in this case virtually compels the conclusion that the state supreme court unreasonably determined that the prosecution, in the course of the pretrial proceedings, had adequately disclosed the favors conferred upon Gilbert. The evidence to that effect is clear and convincing.

That said, the question remains whether this error was sufficiently prejudicial to warrant habeas relief. That question must be answered in the negative unless (i) the

nondisclosure was imputable to the prosecution, (ii) the withheld information was favorable to the petitioner, and (iii) the information was material. In the pages that follow, we examine these points.


### B. **The Failure to Impute Knowledge**.

The petitioner's second claim of error hinges on the premise that the state supreme court wrongly determined that the prosecution bore no responsibility for any failure to disclose. This claim turns on a line of cases that trace their roots to Napue v. Illinois, 360 U.S. 264 (1959). The state supreme court found Napue and its progeny inapplicable here because this was not a

> factual situation wherein the prosecutor could be found to have been negligent in failing to discover and make known, for example, Gilbert's skydiving antics during police-custody confinement. What we do have instead is simply a factual situation where, as the hearing justice found, the prosecution was innocent of any wrongdoing and negligence in not informing or being able to inform defense counsel of the several facts concerning Gilbert's custodial confinement that came to public attention shortly after Gilbert's unexpected death.

Mastracchio v. Moran, 698 A.2d at 718-19. The petitioner assails this finding, arguing that it depends on too myopic a

-19-

view of both the law and the record.  Concluding, as we do, that knowledge of information beneficial to the defendant should be imputed to the prosecutor whenever such knowledge is possessed by a representative of the prosecution, we detect error.

To begin, the state supreme court appears to have misread the findings of the lower court.  Even though the hearing justice found that the Providence police officers had not "suborned, instigated or encouraged Peter Gilbert to withhold evidence," he also found that members of the witness protection team were keenly aware of the more exotic features of Gilbert's confinement.[2]  Mindful of the intense involvement of

---

[2]For example, the hearing justice wrote:

> By the time of the Valente murder trial, both Lt. Tamburini and Sgt. Oates knew that the conditions of Peter Gilbert's "confinement" were far more liberal than he disclosed during that trial and during the earlier [liquor store] robbery trial.  Both police officers were part of the "prosecution team" because they were in charge of Peter Gilbert's custody, had supervised debriefing and had advised the State police when Peter Gilbert provided potential evidence in the Valente murder investigation.

> As of the [liquor store] robbery trial they knew that Peter Gilbert regularly left the police station with a security escort on recreational excursions. They also knew that he had cash on his person which he derived from the Attorney General's reimbursement checks.  They were aware, as was the prosecutor, . . . that Peter Gilbert had regular extended contact with his wife and children, even though the regularity and extent of those visits were never made clear to [the petitioner].

-20-

the attorney general's department in Gilbert's protective custody, we conclude, as did the hearing justice, that the Providence police officers who comprised the witness protection team must be treated as an integral part of the prosecution team for the purpose of determining whether a failure to disclose occurred. See United States v. Wilson, 237 F.3d 827, 832 (7th Cir.), cert. denied, 122 S. Ct. 97 (2001).

As a legal matter, the Supreme Court precedent on this issue is clear. When any member of the prosecution team has information in his possession that is favorable to the defense, that information is imputable to the prosecutor. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) (explaining that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); see also Giglio v. United States, 405 U.S. 150, 154 (1972) (holding that whether nondisclosure results from negligence or design, the prosecutor is responsible).

Giglio illustrates this point in the context of a prosecutor's negligent use of perjured testimony. There, an assistant to the prosecutor secretly promised a witness that he would avoid prosecution if he testified on the state's behalf, but did not reveal the clandestine promise to the prosecutor.

-21-

<u>Giglio</u>, 405 U.S. at 152-53.  At trial, the witness denied the existence of any such promise, and the prosecuting attorney did not correct the testimony.  The Supreme Court made short shrift of the argument that the perjured testimony should be overlooked because the prosecuting attorney himself did not know of its falsity (and was, at most, negligent in failing to discover the truth).  "A promise made by one attorney must be attributed, for these purposes, to the Government."  <u>Id.</u> at 154.

So too <u>Kyles</u>, in which the Court rebuffed the state's argument that an individual prosecutor could not be held accountable for evidence known only to investigators:

> [N]o one doubts that police investigators sometimes fail to inform a prosecutor of all they know.  But neither is there any serious doubt that procedures and regulations can be established to carry the prosecutor's burden and to insure communication of all relevant information on each case to every lawyer who deals with it.  Since, then, the prosecutor has the means to discharge the government's [disclosure] responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

514 U.S. at 438 (citations and internal punctuation omitted).  Imputing the investigator's knowledge to the prosecutor, the Court reasoned, "will tend to preserve the criminal trial, as

-22-

distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations."  Id. at 440.

For purposes of the instant case, these Supreme Court precedents make manifest that the knowledge of other members of the attorney general's department and of the witness protection team must be imputed to the prosecuting attorney.  Having placed Gilbert on the stand to testify on behalf of the state, the prosecutor had a duty to learn of all the inducements and rewards that the state had tendered.  That means that he was chargeable with knowledge that the attorney general's department had funneled significant amounts of cash to Gilbert in the months immediately preceding the trial; that the department had served as a reference for him in connection with the purchase of a new car; and that Gilbert, while incarcerated, had enjoyed sybaritic treatment above and beyond what had been disclosed to the defense (e.g., two unreported trips to Florida, state-sponsored skydiving lessons, and free passage throughout the Providence police station).  We therefore hold that the state supreme court's refusal to impute the police officers' knowledge to the prosecutor runs contrary to established Supreme Court case law.

**C.  The Materiality of the Undisclosed Evidence.**

Having enlarged the dimensions of the withheld information to include what was known to members of the witness protection team, we turn next to whether that corpus of withheld information was material.[3]

It is well-established that the prosecution's failure to disclose favorable information to the defense constitutes a violation of the defendant's constitutional rights only if, and to the extent that, it deprives the defendant of a fundamentally fair trial. See United States v. Bagley, 473 U.S. 667, 678 (1985); Giglio, 405 U.S. at 154. To scale this barrier, the defendant must show that the undisclosed information was material to guilt or to punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

The level of materiality at which nondisclosure effects a constitutional error depends upon whether the prosecution's failure to disclose additional exculpatory or impeaching evidence is simply that, or, alternatively, results from the prosecution's knowing use of false testimony or evidence. We limned this dichotomy in Gilday v. Callahan, 59 F.3d 257 (1st Cir. 1995). There, we made clear that when the prosecution simply fails to disclose evidence that is favorable to the

---

[3]In turning directly to this question, we accept, without further ado, that the withheld information was adverse to Gilbert's credibility and, thus, favorable to the petitioner.

-24-

accused, such evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 267 (citation omitted). For ease in reference, we shall call this the Brady standard. See Brady, 373 U.S. at 87.

A different, more defendant-friendly standard of materiality attaches when a prosecutor has knowingly used perjured testimony or, equivalently, has knowingly failed to disclose the information that would give the lie to perjurious testimony. See United States v. Agurs, 427 U.S. 97, 103-04 (1976); Giglio, 405 U.S. at 154. When that occurs, "a conviction is fundamentally unfair, and must be set aside, if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Gilday, 59 F.3d at 267. For ease in reference, we shall call this more lenient standard of materiality the Agurs standard.

Here, the state supreme court used the Brady standard across the board, requiring the petitioner to "show that there would be a significant chance that the use and development of the posttrial discovered evidence would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." Mastracchio v. Moran, 698 A.2d at 719. In this

-25-

venue, the petitioner asseverates that the court should have applied the more rigorous Agurs standard to the entire body of undisclosed evidence (or, in the alternative, that it unreasonably applied the Brady standard).

In order to determine who has the better of the argument, we must assess the reasonableness of the state supreme court's determination that "even though [Gilbert's] testimony might have been somewhat misleading, it did not amount to perjury." Id. The court made this determination based upon its conclusion that "although Gilbert did not go out of his way to explain all the minute details of his custodial confinement while at the Providence police station, he did in fact answer directly the questions as posed to him by defense counsel." Id. In so concluding, the court relied heavily on Bronston v. United States, 409 U.S. 352, 360 (1973), for the proposition that literally true but unresponsive answers do not constitute perjury.

To test the soundness of this determination, we must examine what Gilbert was asked, how he responded, the literal truth of his answers, and what (if any) falsehoods were known to the prosecution but unknown to the defense. We reiterate that we may set aside the judgment of the supreme court on this matter only if its determination fell "outside the universe of

-26-

plausible, credible outcomes." Matesanz, 230 F.3d at 425 (quoting O'Brien, 145 F.3d at 25).

We undertake this inquiry in considerable detail since the prosecution's knowing use of perjury, if material, "is incompatible with the rudimentary demands of justice." Giglio, 405 U.S. at 153. Indeed, a finding of condoned perjury demands the application of a more lenient standard of materiality not simply because the knowing use of false testimony involves a prosecutorial peccadillo, "but, more importantly because [it] involve[s] a corruption of the truth-seeking function of the trial process." Agurs, 427 U.S. at 104.

Upon perscrutation, one of Gilbert's statements at trial quite obviously crosses the line. The prosecutor, referring to the disclosed fact that the state had regularly reimbursed Gilbert for certain expenses, asked him point blank: "Do you handle any of the cash, physically, yourself?" Gilbert replied: "No, I don't get it." But the post-trial disclosures revealed that Gilbert was given a total of $20,000 in cash in the six months leading up to the trial. Clearly, then, this answer was false, and knowledge of its falsity was imputable to the prosecutor since members of the attorney general's department and/or the witness protection team actually delivered the cash to Gilbert. That leaves the question of whether this

condoned perjury was material in the requisite sense, and, thus, rose to the level of constitutional error. We shall return to that question shortly.

First, however, we deal with the remainder of the undisclosed evidence. In regard to those instances of nondisclosure, the state supreme court determined that they were not occasioned by the prosecutor's reliance on perjurious testimony, known by him to be false yet undisclosed to the defense. Inasmuch as the record supports that determination,[4] the court did not act contrary to the pertinent Supreme Court precedents when it concluded that those instances of nondisclosure (that is, everything except the failure to disclose the manifest falsity of Gilbert's categorical denial that he had received cash) warranted employment of the Brady standard rather than the Agurs standard.[5]

---

[4]This is not to say that Gilbert did not lie in other respects at the petitioner's trial. When the prosecutor queried Gilbert about the conditions of his confinement, Gilbert stated that he had "no contact with the outside world." This answer was literally false, but the petitioner was aware of many of Gilbert's peregrinations (and, thus, knew of the falsity of his response). Then, too, although the petitioner has proffered some evidence that Gilbert used drugs while in custody and asserts that Gilbert perjured himself when he testified to the contrary, he has not provided any evidence that the members of the prosecution or witness protection teams knew of any such drug use.

[5]We think it is altogether proper to segregate out the prosecution's knowing use of perjury from its inadvertent

-28-

We are also persuaded that the state supreme court did not unreasonably apply <u>Brady</u> when it opined, as an alternative holding, that the nondisclosure of this evidence "would not have in any circumstance created a reasonable probability that the jury's verdict would have been any different." <u>Mastracchio</u> v. <u>Moran</u>, 698 A.2d at 715. To support this holding, the court cited the powerful evidence buttressing Gilbert's testimony, <u>id.</u> at 712-13, and noted that his story remained consistent both before and after he received kid-glove treatment from the state, <u>id.</u> at 718.

This conclusion withstands scrutiny. Although Gilbert was the sole witness who placed the petitioner at the scene of the crime, his testimony relating to the petitioner's confession was fully corroborated by other evidence. For example, Gilbert described the victim as still alive when he was thrown into the

_____

failure to disclose other information favorable to the defendant, and to treat those bevues separately. Perjury is to be narrowly construed, and we must not attach the opprobrium that inevitably accompanies it to statements that do not fall within its purview. <u>See</u> <u>Bronston</u>, 409 U.S. at 360-62. This bifurcated approach does not create some strange hybrid. After all, this is not the only situation in which an appellate court must use different measures of prejudice for different errors within a single case. For example, on direct review in federal criminal cases, courts of appeals typically use one benchmark — "harmless beyond a reasonable doubt" — for errors of constitutional magnitude and another — "substantial and injurious effect on the verdict" — for nonconstitutional errors. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Bosch</u>, 584 F.2d 1113, 1117-18, 1122-23 (1st Cir. 1978).

-29-

sea — and the medical examiner's evidence confirmed this fact. Similarly, Gilbert tied the incident to the Jamestown Bridge — a span in close physical proximity to the place where the body washed ashore. Gilbert also recalled that the victim had a plastic plate in his head, and the autopsy revealed that such a plate had been surgically inserted into Valente's skull at some time before the beating. Gilbert said that the victim had been the petitioner's friend; Valente fit this description. Finally, Gilbert had been in Florida from 1978 to 1983 and was unlikely to have heard such details from anyone who was not privy to the crime. This chain of similarities, forged by one who would otherwise have little opportunity to acquire this knowledge, strongly supports the conclusion that the jury probably would have believed Gilbert even if the additional details of his confinement were fully exposed.

Furthermore, Gilbert, even without the withheld information, was a sullied witness. The petitioner's trial counsel had a great deal of adverse information at his disposal, and he fiercely attacked Gilbert's credibility at the trial — an attack that included the sordid details of Gilbert's prior drug use, his extensive criminal record, and his previous lies under oath. Gilbert's credibility was significantly impeached by

reason of this sustained assault — yet the jury nevertheless believed his account of the petitioner's boasting.

That ends this aspect of the matter. Although we might well have concluded differently on direct review, we are confident that the state supreme court reached a plausible and credible outcome on the basis of the record. Consequently, we are not at liberty to disturb that outcome. See Taylor, 529 U.S. at 411 (holding that an erroneous, but not unreasonable, application of Supreme Court precedent will not justify habeas relief); Matesanz, 230 F.3d at 429 (same).

### D. __The Materiality of the Perjury__.

We now return to the prosecution's knowing use of Gilbert's false testimony about the cash payments. Since the Agurs standard of materiality obtains in respect to this perjurious statement, see supra, it follows from what we already have said that the state supreme court departed from established Supreme Court precedent when it applied the Brady standard in these purlieus. The question, then, is whether there is any reasonable likelihood that Gilbert's falsehood might have affected the jury's ultimate judgment.[6] Agurs, 427 U.S. at 103.

---

[6]The state attempts to devalue this bit of testimony, saying that it goes only to the credibility of the witness. That begs the question. See Napue, 360 U.S. at 269-70 (observing that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence").

On reflection, we do not believe that disclosure of the cash payments prior to trial conceivably could have affected the verdict. As the state supreme court observed, Gilbert told a consistent story all along. Mastracchio v. Moran, 698 A.2d at 718. The fact that Gilbert had staked out his position well before he received any emoluments renders remote any possibility that the jury would have thought that he had fabricated his story in return for cash. Then, too, the unusual nature of Gilbert's testimony (i.e., his recital of facts that only could have been known to the perpetrator of a crime that was committed while he was in an out-of-state penitentiary) makes it highly unlikely that his truthfulness could be impeached by information that he was accepting monies from the state. Last — but surely not least — Gilbert's credibility was a major focus of the trial, and the jury knew that he was no choirboy. At the very least, Gilbert was a sullied witness — and information about the cash payments was unlikely to have tipped the balance and changed the minds of those who credited his testimony. After all, the defense and the jury knew that the state had regularly reimbursed Gilbert for certain expenditures — at a rate of $1,500 to $1,800 per month — and the delivery of an additional $1,000 to $2,000 per month in cash derived from those

reimbursement checks was merely a further entry in the ledger of special favors.

Taken in the ensemble, these factors foreclose all reasonable likelihood that the jury, had it known of the cash payments, could have reached a different outcome. Consequently, we hold that prosecution's failure to disclose that Gilbert had received cash payments from the state was not material. Accordingly, even though the state supreme court's failure to apply the Agurs standard to the nondisclosure of cash payments was contrary to settled Supreme Court precedent, the error was not of constitutional dimension. We hold, therefore, that the petitioner's trial was not fundamentally unfair.

## IV. CONCLUSION

We need go no further. This case involves an appalling chapter in the history of Rhode Island law enforcement — a chapter made all the more sordid by the ineptitude with which the prosecution handled its disclosure obligations vis-à-vis the kid-glove treatment that Gilbert received. On habeas review, however, our function is not to punish a state for prosecutorial misconduct unless that misconduct gave rise to a constitutional error that prejudiced the petitioner. Here, the state's highest court concluded that, although the petitioner did not receive a perfect trial, he received a fair one. Despite the fact that

-33-

the state court committed three errors in its multifaceted analysis, we conclude that its bottom-line assessment was not unreasonable.  It follows that the petitioner has not shown the requisite constitutional injury (and, accordingly, that the district court did not err in refusing to issue a writ of habeas corpus).

**Affirmed.**

**— Separate Opinion Follows —**

**LIPEZ, Circuit Judge** (concurring in the judgment). I agree with my colleagues that the judgment below should be affirmed. I am persuaded that the state court was not unreasonable in its conclusion that the additional undisclosed evidence "would not have in any circumstance created a reasonable probability that the jury's verdict would have been any different." Mastracchio v. Moran, 698 A.2d 706, 715 (R.I. 1997). As the majority opinion notes, Gilbert was already a "sullied witness" even without the undisclosed information, and "yet the jury nevertheless believed his account of the petitioner's boasting." I agree that it was not reasonably likely that the undisclosed information could have changed the minds of those who believed Gilbert's testimony.

I write separately, however, because I disagree with the majority's articulation of the reasonableness standard in 28 U.S.C. § 2254(d)(1). Specifically, I take issue with its adherence to the principle that, for a writ to issue, "the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998). My concern here, similar to that voiced by Judge Lynch in her concurrence in Kibbe v. DuBois, 269 F.3d 26 (1st Cir. 2001), is that this

particular aspect of O'Brien is inconsistent with the reasonableness standard set forth in a subsequent Supreme Court decision, Williams v. Taylor, 529 U.S. 362 (2000), and has thus been overruled.

In Williams, the Supreme Court read § 2254(d)(1) to mean that a habeas writ does not "issue simply because [a federal] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." 529 U.S. at 411. The Williams Court rejected the standard advanced by the Fourth Circuit that a state court decision involves an "'unreasonable application of . . . clearly established Federal law' only if the state court has applied federal law 'in a manner that reasonable jurists would all agree is unreasonable.'" Id. at 409 (quoting Green v. French, 143 F.3d 865, 870 (4th Cir. 1998)). The Court explained that "[t]he federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." Id. at 409-10.

In Brown v. Maloney, 267 F.3d 36 (1st Cir. 2001), a case that we decided subsequently to O'Brien without applying the O'Brien standard, the panel emphasized that the "unreasonable application" prong under § 2254(d)(1) "reduces to the question of whether the state court's derivation of a case-specific rule from the Supreme Court's jurisprudence on the point appears to be objectively reasonable. The test is not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable." 267 F.3d at 40 (citing Williams, 529 U.S. at 409-10). I am inclined to agree with this formulation. I do not believe that, read literally, the "outside the universe of plausible, credible outcomes" test of O'Brien is consistent with it.

Indeed, I must confess that I struggle to understand how the O'Brien standard actually works. For example, that standard could mean that if one court applied or could apply the relevant federal rule in the same manner as the state court decision under review, that state court decision would not be outside the universe of plausible, credible outcomes. If so, such a standard reduces the "unreasonable application" standard to the subjective inquiry rejected in Williams, and effectively requires that all reasonable jurists agree that the state court decision was unreasonable. Although I recognize the sea change

-37-

in habeas review enacted by AEDPA, I do not understand that change to require an "unreasonable application" standard for § 2254(d)(1) that virtually insulates state court decisions from meaningful review.

Again, however, this exception to the majority's opinion does not alter my view that the majority opinion reaches the correct result. For that reason, this concurrence is not an occasion to elaborate further on the exception that I note. Eventually, however, there will be a case where the formulation of the "unreasonable application" standard does make a difference and we will have to resolve this important issue.