William Kenney, Jr. v. USA          CV-97-603-B    05/15/02
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**William F. Kenney, Jr.**

   **v.**                              Civil No. 97-603-B
                                       **Opinion No. 2002 DNH 099**
**United States of America**


## MEMORANDUM AND ORDER

   William Kenney was convicted of conspiracy to commit bank robbery, armed and unarmed robbery, violation of the Hobbs Act, and using and carrying firearms during the commission of crimes of violence.  He argues in a motion filed pursuant to 28 U.S.C. § 2255 that his convictions must be vacated because the government withheld exculpatory evidence during his trial.  I reject Kenney's motion because he has not established that the government's alleged misconduct prejudiced his defense.


## FACTS

   The government contended at trial that Kenney was a participant in a conspiracy led by co-defendant Charles Flynn to commit several armed robberies during the spring and summer of

1991.  Kenney's exculpatory evidence claims relate specifically to his convictions for the June 7, 1991 robbery of an employee of a retail store known as the Dress Barn (the "Dress Barn robbery"), the August 3, 1991 robbery of James Fitzpatrick's home (the "August 3rd robbery"), the August 17, 1991 robbery of James Fitzpatrick's person (the "August 17th robbery"), and the September 9, 1991 robbery of the Stratham branch of the First New Hampshire Bank (the "First N.H. robbery").  I summarize the trial testimony and the allegedly withheld evidence that pertains to each robbery in turn.

## A.    The Dress Barn Robbery

### 1.  Trial Testimony

Linda Sherouse, a Dress Barn employee, was robbed on June 7, 1991 as she was attempting to deposit $763 into a night deposit box at the First National Bank's North Hampton, New Hampshire branch office.  She testified at trial that her assailant was between 18 and 22 years old, was approximately 5'8" tall, and weighed between 150 and 160 pounds.[1]  She recalled that he was

---

[1]  Kenney is 5'11" tall.  He was 22 years old when the robbery occurred and he weighed approximately 175 pounds at the time of trial.

wearing jeans and a bright blue Patagonia jacket with an emerald green collar.  He also was wearing a white "woodworker's" mask and was carrying a semi-automatic handgun.

The government relied on testimony from several co-conspirators to implicate Kenney as the perpetrator of the Dress Barn robbery.  Thomas McQueeney testified that Flynn asked McQueeney during an evening in June to take Kenney to a spot in North Hampton a few hundred yards from the site of the robbery. Kenney was carrying a bag containing a white "painter's" mask and a semi-automatic handgun when McQueeney dropped him off near the bank.  The next day, McQueeney overheard Flynn taunting Kenney by claiming that he would rather rob a woman carrying only $600 than a man carrying more money because he was too afraid to rob a man. Kenney responded by stating that he had robbed a woman "because that was who was there."

Another co-conspirator, Richard Ferguson, testified that Kenney admitted that he had robbed several night depositories in New Hampshire.  Finally, co-conspirator Brian Raineri testified that he had had discussions with Kenney concerning how to rob night depositories.

## 2. Undisclosed Evidence

The officers investigating the Dress Barn robbery used a police tracking dog to determine the path that the robber followed as he left the scene. The dog picked up a scent and followed it behind the bank to an asphalt walkway. There, the dog lost the scent and police surmised that the robber left in a car that may have been parked in a nearby lot. If, instead, the robber had continued to walk south through a wooded area, he could have emerged from the woods at the back of a nearby restaurant. In an effort to determine whether anyone at the restaurant had seen the robber, Hampton police detective, Philip Russell, interviewed the restaurant's general manager, Timothy Gilpin.

Detective Russell's interview report noted that Gilpin was wearing glasses and a bright royal blue shirt, was 35 years old, was 5'8" tall and had a small pot belly. Detective Russell also noted that Gilpin's eyes were bloodshot and that his speech was slow and slurred. Gilpen told Detective Russell that he had been working in his office on the second floor at the time of the robbery but had not witnessed anything suspicious.

The government informed Kenney that a police dog had picked up a scent at the scene and followed it to the asphalt walkway. Kenney alleges, however, that the government withheld Detective Russell's report of his interview with Gilpen. He claims that the report is exculpatory because it provides a description of Gilpen that is in some respects similar to Sherouse's description of her assailant.

## B. The August 3rd Robbery

### 1. Trial Testimony

James Fitzpatrick's residence in Hampton, New Hampshire, was robbed on August 3, 1991, while he and other family members were asleep in the residence. The robbers took a number of Hummel figurines as well as a small amount of cash, various other personal items, and an undetermined number of checks.

The government relied on testimony from two co-conspirators to prove that Kenney participated in the robbery. Brian Raineri testified that Flynn planned the robbery, he and Kenney committed the robbery, and Flynn, McQueeney, and Brian's brother, Bruce Raineri, provided transportation. McQueeney corroborated Raineri's testimony and provided additional details concerning

his planning sessions with Flynn. He also testified that Kenney told him that he and Raineri had taken several Hummel figurines from Fitzpatrick's residence.

### 2. Undisclosed Evidence

Detective Russell obtained videotape bank surveillance pictures of a then-unknown person who was shown cashing several checks that Raineri had taken from Fitzpatrick's residence during the August 3rd robbery. The government also learned from Raineri that he had sold the checks to Charles Petralia, a relative of Raineri's by marriage. Petralia, who died in February 1991, had a lengthy criminal record involving convictions for theft of mail and armed robbery.

Kenney asserts that the government failed to disclose both the bank surveillance pictures and Raineri's claim that he had sold Fitzpatrick's checks to Petralia. He argues that the withheld evidence is exculpatory because it suggests that Raineri committed the robbery with Petralia, rather than Kenney.

## C. The August 17th Robbery

### 1. Trial Testimony

On August 17, 1991, James Fitzpatrick was robbed of

approximately $2,300 as he was attempting to enter his residence. Fitzpatrick described his assailant as a white male who was 5'8" to 5'9" tall and weighed approximately 155 pounds. Fitzpatrick recalled that the robber wore a sweatshirt with a hood that he had pulled over his head and tied down over his eyes and under his nose.

At trial, another co-conspirator, Richard Ferguson, testified that Kenney told him that he had robbed Fitzpatrick.

## 2. Undisclosed Evidence

Richard Ferguson admitted at trial that he had been convicted of armed robbery in 1980 and that he had had a significant drug problem. He claimed, however, that he had not committed any other robberies from 1986 until 1991,[2] when he met Flynn and became involved in the criminal conspiracy on which Kenney's convictions are based.

Richard Ferguson's brother, James, later testified in an unrelated case that, in 1990, Richard had driven with him and

---

[2] Kenney argues that Ferguson testified that he had not been involved in anything illegal during this time period. A fair reading of the trial transcript, however, indicates that Ferguson stated affirmatively only that he had not been involved in any robberies between 1986 and 1991.

three other men in two cars to the residence of a person who had stolen $60,000 from one of his associates. James gave the three men weapons and told them to "light up the house." After issuing these instructions, James and Richard left the scene and the three remaining men then fired a number of shots into the residence.

Kenney claims that the government knew about this incident prior to his trial and failed to disclose it. He argues that the evidence is exculpatory because it would have been valuable impeachment evidence given Ferguson's claim that he had not been involved in any robberies between 1986 and 1991.

## D. **The First N.H. Robbery**

### 1. **Trial Testimony**

Two men wearing masks robbed the Stratham branch of the First New Hampshire Bank at approximately 7:45 a.m. on September 9, 1991. More than $200,000 was taken during the robbery. The police, who investigated the robbery with the help of a tracking dog, concluded that the robbers had approached the bank through a nearby cornfield and entered through a rear window.

Three bank employees described the robbery at trial. Laura MacPherson stated that she and a co-worker, Anita Ramsdell,

arrived for work at 7:45 a.m.  They entered the bank and encountered two masked men, who informed them that they were robbing the bank.  MacPherson remembered that one of the men was big and wore a red "Champion" sweatshirt, blue sweat pants, white "Champion" sneakers, work gloves, and a knitted mask that covered his face.  She recalled the other man as being thin, and that he wore a black sweatshirt, black sweat pants, black sneakers, and a knitted mask that covered his face.  She recalled that one of the men had a black, semi-automatic handgun.  Ramsdell's description of the robbers was consistent with MacPherson's.  Ramsdell recalled that the man wearing black held the gun, and that the man wearing a red sweatshirt did not have a weapon.  The women described the two robbers as white males.

A third bank employee, Kelley McCoy, testified that she entered the bank while the robbery was in progress.  McCoy remembered that the thin man was approximately 6'0" tall, and that he wore black sweat pants, a dark colored mask, black shoes and brown gloves.  McCoy also noticed that he had burrs stuck to his shoelaces and that he had a black, semi-automatic handgun.  McCoy stated that the larger man with the red sweatshirt put the money into a cardboard box, and that the man wearing black bound

the three employees with duct tape.  The man wearing black demanded the keys to McCoy's car, a brown Pontiac Grand Am, and the two men used the car to make their escape.

Three co-conspirators testified concerning Kenney's role in the robbery.  McQueeney told the jury that he, Flynn, and Kenney had driven to several different banks in the Seacoast area in June 1991, looking for potential targets.  On two or three occasions, McQueeney also drove Flynn and Kenney to the First New Hampshire Bank office in Stratham.  Flynn remarked during one of these trips that the farmland adjacent to the bank would provide excellent cover for Kenney's escape.

Two other co-conspirators, Arthur Cosgro and Ferguson, testified that they committed the robbery with Flynn and Kenney.  Both men claimed that on the evening prior to the robbery, the four robbers traveled to a side street near the bank and stopped at a nearby cornfield.  Kenney and Flynn then walked to the back of the bank where they pried open a window with a crow-bar.[3]  After determining that the bank did not have an alarm system,

---

[3]  Cosgro testified that Kenney and Ferguson were the ones who pried open the window and that Kenney later returned to the bank with Flynn so that Flynn could inspect their work.

-10-

both men returned to the vehicle.  The four robbers then left the scene and spent the night at a nearby motel, where Kenney signed for a room using a credit card that Cosgro had stolen from a health club in Rhode Island.

The four robbers returned to the bank at approximately 6:00 a.m. the next morning.  Cosgro and Flynn dropped Kenney and Ferguson at the edge of the cornfield.  The two men then headed toward the bank wearing ski masks and carrying duct tape and semi-automatic handguns.  Ferguson was wearing a red "Champion" sweatshirt and white "Champion" sneakers.  Once inside, they waited until the bank's employees arrived for work and coerced them into opening the vault.  Ferguson testified that he and Kenney took the available cash and escaped in a bank employee's vehicle.  They then drove to a designated meeting place, abandoned the employee's car and left the scene with Flynn and Cosgro.

The government produced substantial evidence to support the co-conspirators' testimony.  First, it called several state police officers who placed Flynn and Kenney in the vicinity of the bank under suspicious circumstances in the weeks prior to the robbery.  On July 31, 1991, officers observed Flynn drive alone

-11-

past the First N.H. Bank, then turn around on Frying Pan Lane, a road just north of the bank and adjacent to the cornfield. Later that day, they observed Flynn following an armored car on Route 101. When the armored car pulled into the First N.H. Bank, they observed Flynn pull over south of the bank, get out of his car, and watch the armored car as it conducted business at the bank. On August 2, 1991, the officers observed Flynn's vehicle sitting unoccupied next to the cornfield adjacent to the bank. The officers later saw Flynn and Kenney walking along a dirt road near the bank, in the direction of Flynn's parked car. On August 6, 1991, the officers observed Flynn and Kenney park Flynn's vehicle on a dirt road and walk into the woods adjacent to the bank, where they stayed for approximately fifteen minutes. That night, Flynn, Kenney and Ferguson were seen at Flynn's house in Hampton, New Hampshire. The next morning, the three were observed leaving Flynn's house together. Later that day, Flynn was seen driving alone near the bank and then sitting in his car on Frying Pan Lane. Still later in the day, Flynn was observed on Frying Pan Lane with his car door open and a person standing beside the door. Shortly thereafter, he was seen driving away from Frying Pan Lane with Kenney and Ferguson as passengers. The

officers last observed Flynn and Kenney near the bank on August 14, 1991.  The two were in the parking lot at the Market Basket on Route 101 while an armored car was parked at the bank.  When the armored car left the bank, Flynn and Kenney followed it toward Exeter, New Hampshire.

Kenney and Flynn also were together shortly after the robbery under circumstances that support the government's contention that Kenney participated in the robbery.  Tanya Ferguson, Richard Ferguson's niece, testified that she encountered Flynn and Kenney in mid-September 1991 at the home of her mother, Patricia Ferguson, in Upland, California.  Kenney told Tanya Ferguson that he was in California because he and Ferguson had robbed a bank in New Hampshire, and that the bank robbery had been his "dream in life."  On October 8, 1991, Tanya Ferguson witnessed Flynn and Kenney counting a large sum of money in an upstairs bedroom in her mother's home.  Shortly thereafter, she saw Kenney carry a black bag into the garage.  She had previously noticed the bag in the bedroom where the two had been counting money, and had seen Flynn hand the bag to Kenney as he said, "Don't let anything happen to this - we get caught for it, we'll be in trouble."

## 2. Undisclosed Evidence

The farmer who owned the cornfield adjacent to the bank testified at trial that he saw a small, red, foreign-made hatchback or station wagon[4] parked on Frying Pan Lane next to the cornfield on the day prior to the robbery.

Kenney discovered after he was convicted that the government at one time suspected that the car the farmer had seen parked on Frying Pan Lane was a red Nissan Maxima owned by Glenn Kerivan. The government developed this suspicion on September 14, 1991 after police officers investigating an unrelated robbery of a Service Merchandise store noticed the Maxima parked outside a Malden, Massachusetts hotel room occupied by Kerivan, Richard Ferguson, and James Hufnagle. The officers entered the hotel room and arrested Ferguson and Hufnagle for the Service Merchandise robbery. The officers discovered that Ferguson and Hufnagle each were carrying in excess of $3,000 in cash that

---

[4] None of the other witnesses referred to the red car during the trial. McQueeney testified that he drove Flynn to the bank and several other possible robbery sites in a red Ford Festiva. While a Festiva is a small, foreign-made hatchback that corresponds to the farmer's description of the car he saw, the government did not argue at trial that any of the robbers drove the Festiva to the scene the day prior to the robbery.

could not be tied to the Service Merchandise robbery.  The police also conducted a warrantless search of the Maxima.  They discovered a partially-used roll of duct tape and a tire changing kit that contained a prybar.  New Hampshire Police Sergeant Colin Forbes used this information and other evidence he had collected during his investigation of the First N.H. robbery to obtain a warrant to search the Maxima.  In the affidavit he submitted in support of the warrant application, he concluded that "[t]he subject red 1987 Nissan Maxima herein described may have been used in the planning of [the First N.H.] robbery, particularly when a red foreign car was observed in the cornfield immediately adjacent to the bank."

Kenney argues that Forbes' affidavit and other police reports pertaining to Ferguson's arrest[5] and the search of the Maxima are exculpatory because they suggest that Ferguson committed the First N.H. robbery with Kerivan and/or Hufnagle,

_____

[5] Police searched bags of clothing taken by hotel management after Ferguson's arrest from the room he had rented.  In the bags they found a red "Champion" sweatshirt, a pair of blue sweat pants, six pairs of white sneakers, and a pair of black "Converse Magic" jogging pants.  I reject Kenney's argument that the presence of these clothes in Ferguson's hotel room at the time of his arrest implicates Kerivan and/or Hufnagle in the First N.H. robbery.

rather than Kenney.

**<u>DISCUSSION</u>**

Kenney has presented four exculpatory evidence claims in support of his motion for a new trial, each pertaining to one or more of the robberies described above.  Because Kenney did not raise his claims during his direct appeal, he must show "cause" for his  procedural default and "prejudice" resulting from the government's failure to disclose the allegedly exculpatory evidence.  See <u>Sustache-Rivera v. United States</u>, 221 F.3d 8, 17 (1st Cir. 2000) (applying cause and prejudice test to defaulted claims asserted in a § 2255 petition); <u>Strickler v. Greene</u>, 527 U.S. 263, 289 (1999) (applying cause and prejudice test to defaulted exculpatory evidence claim).  To show "cause," "a petitioner must demonstrate that some 'external impediment, whether it be government interference or the reasonable unavailability of the factual basis for the claim, must have prevented [him] from raising the claim.'" <u>Watkins v. Ponte</u>, 987 F.2d 27, 31 (1st Cir. 1993) (citing <u>McCleskey v. Zant</u>, 499 U.S. 467, 497 (1991)) (alteration in original).

"[I]n order to show prejudice sufficient to overcome a

procedural default, a habeas petitioner 'must convince [the court] that there is a reasonable probability that the result of the trial would have been different' absent the error." Prou v. United States, 199 F.3d 37, 49 (1st Cir. 1999) (quoting Strickler, 527 U.S. at 289). "The question is not whether the defendant would more likely than not have received a different verdict with the [wrongfully withheld] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (citing Strickler, 527 U.S. at 289-90) (internal quotation marks omitted) (alteration in original).

I will assume for purposes of analysis that Kenney can establish "cause" for his failure to raise his exculpatory evidence claims in his direct appeal.[6] Thus, I will determine with respect to each claim whether the government's alleged failure to produce the evidence in question prejudiced his defense.

---

[6] I also assume, without deciding, that the government withheld the evidence and that it would have been admissible at Kenney's trial.

## A.    <u>The Dress Barn Robbery</u>

Kenney's conviction for the Dress Barn robbery rests on a substantial amount of evidence put forth at trial.  Co-conspirator testimony revealed that Kenney: (i) discussed how to rob night depositories; (ii) admitted to robbing several night depositories in New Hampshire; (iii) was dropped off at a spot a few hundred yards from the site of the robbery on an evening in June, carrying a white "painter's" mask and a gun; and (iv) admitted the next day that he had robbed a woman.  Further, Sherouse's description of the robber closely matched Kenney, who was the same age and was only three inches taller and 15 pounds heavier than the upper range of Sherouse's description of her assailant.

In contrast, there is no evidence suggesting that Gilpin committed the crime other than that he was working at a nearby restaurant when the robbery occurred, he was approximately the same height as the robber, and he was wearing a shirt that was similar in color to the jacket that Sherouse claimed the robber had worn.  Absent more, this kind of "other suspect" evidence is simply too insubstantial to give rise to "a reasonable probability that the result of [his] trial would have been

different" if Kenney had been able to introduce evidence about Gilpin at trial. Prou, 199 F.3d at 49 (quoting Strickler, 527 U.S. at 289); see also Downs v. Hoyt, 232 F.3d 1031, 1036-37 (9th Cir. 2000) (concluding that petitioner did not show reasonable probability that result of her trial would have been different if prosecution had turned over pictures and names of other suspects); Coleman v. Calderon, 150 F.3d 1105, 1116-17 (9th Cir. 1998), rev'd on other grounds, 525 U.S. 141 (1998) (holding other suspects not material[7] without direct or circumstantial evidence linking them to actual perpetration of the crime).

## B.   **The August 3rd Robbery**

Applying the same standards set forth in the previous section, I conclude that Kenney fails to demonstrate prejudice resulting from the prosecution's failure to disclose evidence relating to Charles Petralia's possible involvement in the August

---

[7] The same standard for determining prejudice applies to determining materiality. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [T]he conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Downs, 232 F.3d at 1037 (citing United States v. Bagley, 473 U.S. 667, 678, 682 (1985)) (internal quotation marks omitted).

3rd robbery.  Kenney's conviction for this robbery was based on detailed co-conspirator testimony.  One of these co-conspirators also testified that he had sold or otherwise disposed of items taken during the robbery.  Thus, evidence that Petralia cashed checks taken from Fitzpatrick's residence is in no way inconsistent with the jury's finding that Kenney had participated in the August 3rd robbery.

Kenney has offered no additional direct or circumstantial evidence linking Petralia to the August 3rd robbery other than that he cashed checks that one of Kenney's co-conspirators claims he sold him.  This scant evidence fails to suggest, had Kenney introduced it at trial, a reasonable probability that the result of his trial would have been different.  See Downs, 232 F.3d at 1037.

## C.  The August 17th Robbery

Kenney's conviction for the August 17th robbery of Fitzpatrick's person rests almost entirely on the testimony of co-conspirator Richard Ferguson.  Kenney raises an exculpatory evidence claim that the government withheld valuable impeachment

evidence relating to Ferguson's criminal history.[8]  The undisclosed evidence about Ferguson's involvement with a shooting in 1990, however, fails to meet the standard for prejudice.

The facts here are similar to those at issue in Mastracchio v. Vose, 274 F.3d 590 (1st Cir. 2001).  In that case, a government witness who was an incarcerated prisoner did not fully inform the jury about the favorable treatment he received from the government in return for his testimony.  See id. at 593-96.  The First Circuit determined that one of the witness's answers to a cross-examination question was clearly false, and that knowledge of its falsity could be imputed to the prosecutor.  See id. at 602.  Upon analysis, however, the First Circuit agreed with the Rhode Island Supreme Court's conclusion that the undisclosed evidence regarding the witness's favorable treatment "would not have in any circumstance created a reasonable probability that the jury's verdict would have been any different."  Id. at 603 (internal citation omitted).  The court considered the fact that the witness's testimony had been

_____

    [8] This claim relates to all counts on which Kenney was convicted based in part on Ferguson's testimony.  I discuss it here because the August 17th robbery rests almost solely upon testimony from Ferguson.

consistent, and that his "credibility was a major focus of the trial, and the jury knew that he was no choirboy." Id. at 604.

As in Mastracchio, the jury in Kenney's trial was aware of Ferguson's criminal history, Ferguson's credibility was a major issue at trial, and Ferguson's testimony was consistent. It is true that Ferguson was an important witness in the prosecution's case against Kenney. However, Kenney has not shown that there is a reasonable probability that the result of his trial would have been different if he had been able to impeach Ferguson with evidence that Ferguson had been present with his brother during the crime that occurred in 1990. Indeed, Ferguson's alleged involvement in the 1990 incident is obviously not inconsistent with his claim that he had not been involved in any robberies between 1986 and 1991, because the 1990 incident was not a robbery. Further, even if Kenney had been able to confront Ferguson at trial with his brother's testimony about the 1990 incident, it is unlikely that any cross-examination on the subject would have added significantly to Kenney's defense because it is likely that Ferguson would claim that he was a mere bystander who was not otherwise involved in his brother's criminal activity. For all these reasons, Kenney fails to meet

-22-

the prejudice standard necessary to present his claim at this late stage of the proceedings.

## D.  **The First N.H. Robbery**

Like Kenney's other exculpatory evidence claims, his argument involving the red Nissan Maxima fails to meet the prejudice standard.  Nothing about the evidence he cites contradicts the substantial evidence establishing his involvement in the First N.H. robbery.

Police observed and took surveillance photographs of Flynn and Kenney following an armored car and watching the First N.H. Bank during the months prior to the robbery.  Co-conspirators testified about Kenney's involvement in the planning and preparation for the robbery, and about his actual participation as one of the two men who entered the bank.  The bank employees who were present at the time of the robbery gave a physical description of the robber's height and weight that was consistent with Kenney's build.  Tanya Ferguson testified about Kenney's presence in California after the robbery, Kenney's confession to her that he had robbed a bank in New Hampshire, and about seeing Kenney counting a large sum of money.

In light of this considerable evidence, Kenney cannot

credibly claim that there is a reasonable probability that the result of his trial would have been different if he had been able to introduce evidence concerning the red Nissan Maxima. Prosecutors would likely have countered Kenney's suggestion that the duct tape found in the car was connected to the robbery with the explanation that its owner had been using the duct tape to seal a leak in the car's sunroof. In addition, prosecutors might have pointed out that, while investigators at one point believed the red Nissan Maxima could have been used in planning the bank robbery, they later rejected this conclusion. Finally, it is worth noting that while a Nissan Maxima is a foreign car, it is a sedan that is unlikely to be characterized as a small hatchback or station wagon, the type of car the farmer claims he saw. Kenney can point to no additional evidence implicating either Kerivan or Hufnagle in the First N.H. robbery. The allegedly withheld evidence he cites falls far short of putting Kenney's case "in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (citing Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

## CONCLUSION

Although I have analyzed Kenney's exculpatory evidence claims individually, I also find that the claims do not call into question the reliability of his convictions when they are considered together. The government painted a compelling picture at trial of Kenney's guilt. The few isolated pieces of allegedly exculpatory evidence he cites could not possibly have affected a reasonably jury's assessment of his guilt. Accordingly, I deny his motion because he has failed to demonstrate that he was prejudiced by the government's alleged failure to produce the withheld evidence prior to his trial.

Kenney's motion for a new trial (doc. no. 22) is denied.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

May 15, 2002

cc:   Peter E. Papps, Esq.
       Bjorn Lange, Esq.